WILLIAM S. HAGAMAN and BONNIE C. HAGAMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hagaman v. Commissioner
Docket No. 747-85.
United States Tax Court
T.C. Memo 1987-549; 1987 Tax Ct. Memo LEXIS 541; 54 T.C.M. (CCH) 992; T.C.M. (RIA) 87549; October 27, 1987. *541 H and W controlled a corporation, T, which operated five truck stops. During the years in issue, H received cash diverted from vending machines located in such truck stops. T also made payments for the maintenance of H's yacht, for H's legal expenses, and for construction of homes for the children of H and W. In Dec. 1975, H contributed $ 9,500 to the capital account of E, a small business corporation owned by him. He received a distribution of capital from E in the same amount in Jan. 1976. Held:
(1) H and W received dividend income from the cash diverted from the truck stops and from the payments made by T on their behalf. (2) H's contribution to E's capital was made solely to increase his basis in the stock of E. Therefore, H and W are not entitled to the losses attributable to E claimed by them. (3) H and W did not receive an interest payment of $ 9,500 from T in 1975. (4) H is liable for the addition to tax for fraud under sec. 6653(b), I.R.C. 1954, for all the years at issue. *544 William E. Frantz, Donald B. DeLoach, and John B. Grattan, for the petitioners. Lourdes M. DeSantis and Roslyn G. Taylor, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Addition to Tax
Sec. 6653(b)
Year
Deficiency
I.R.C. 1954 [1]
1975
$ 191,081.00
$ 95,540.50
1976
199,079.00
99,539.50
1977
137,029.00
68,514.50
1978
140,937.00
70,468.50
After concessions, the issues remaining for our decision are: (1) Whether the petitioners received dividend income from a corporation controlled by them in the amounts determined by the Commissioner; (2) whether the petitioners are entitled to losses from a small business corporation claimed by them in 1975, 1976, and 1977; (3) whether the petitioners must report as interest income $ 9,500 which the Commissioner determined was received by them in 1975; and (4) whether petitioner William S. *545 Hagaman is liable for the addition to tax for fraud under section 6653(b) for 1975 through 1978. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. At the time the petition was filed in this case, the petitioners, William S. and Bonnie C. Hagaman, husband and wife, resided in Chattanooga, Tennessee. They filed their joint Federal income tax returns for 1975, 1976, 1977, and 1978 with the Internal Revenue Service Center in Memphis, Tennessee. The petitioners have one son, Williams S. Hagaman, Jr. (Bill, Jr.), and one daughter, Deborah Hagaman Hackney. During the years in issue, Deborah was married to George Phillip Hackney. In 1952, Mr. Hagaman acquired a one-half interest in Superior Trucking Service, Inc. (Superior), a freight line. In 1958, he acquired complete ownership of the company. Subsequently, Superior acquired and operated several trucking terminals located in Tennessee and Alabama. During the 1960s, Mr. Hagaman expanded his activities to include the sale of petroleum products at the truck terminals operated by Superior. He also became involved in the construction business through Hagaman Construction Company (Hagaman *546 Construction), a corporation wholly owned by him. After Hagaman Construction developed financial difficulties, Mr. Hagaman transferred a truck stop business in Knoxville, Tennessee, known as Hagaman Truck Haven (the Knoxville truck stop) to it in the hope that the truck stop would generate sufficient income to pay Hagaman Construction's debts. On July 1, 1969, Hagaman Construction acquired the assets and assumed the liabilities of Hagaman Truck Haven. The corporation's name was then changed to Hagaman Truck Haven, Inc. (Truck Haven). At such time, Mr. Hagaman owned all the outstanding stock of Truck Haven. On September 24, 1969, two new truck stops were incorporated. One of such truck stops was located near Lebanon, Tennessee, and was known as Hagaman Truck Harbor, Inc. (the Lebanon truck stop). The second of such truck stops was located near Franklin, Tennessee, and was known as Hagaman Truck Huddle, Inc. (the Franklin truck stop). Mrs. Hagaman was the sole stockholder of both Hagaman Truck Harbor, Inc., and Hagaman Truck Huddle, Inc. In 1971, Truck Haven leased a truck stop in Chattanooga, Tennessee, known as Johnson One Stop Motor Center Co. (the Chattanooga truck *547 stop). In 1974, Truck Haven leased a truck stop in Nashville, Tennessee, known as the Music City Truck Stop (the Nashville truck stop). The Chattanooga truck stop was leased from the estate of the former operator of such truck stop. The truck stops at Lebanon, Franklin, and Nashville were leased from Union 76 Oil Company (Union 76). Under such leases, Union 76 was to receive a base rent plus 10 percent of the vending income earned by each of the three truck stops. On January 1, 1975, Truck Haven merged with Hagaman Truck Harbor, Inc., and Hagaman Truck Huddle, Inc., with Truck Haven emerging as the surviving corporation. After the merger, all of the stock of Truck Haven was owned by Mr. and Mrs. Hagaman, and Mr. Hagaman pursued his business interests through Truck Haven. In June 1977, Truck Haven and Superior entered into a statutory merger, with Superior emerging as the surviving corporation. Immediately after such merger, Superior adopted Truck Haven's corporate name. During the years in issue, Truck Haven used the accrual method of accounting and reported its income on a calendar year basis. However, in 1977, such corporation filed two Federal income tax returns. *548 As a result of the merger between Superior and Truck Haven, such corporation filed a return for the period January 1 through June 30, 1977, and another return for the period July 1 through December 31, 1977. During the years in issue, the main office of Truck Haven was in Chattanooga, Tennessee, at a location separate from the truck stops operated by such corporation. During such years, Mr. Hagaman was the president and principal stockholder of Truck Haven. Bill, Jr., was the vice president of Truck Haven. Ervin L. Daugherty is a certified public accountant and served as the secretary and controller of such corporation from 1973 through 1981. Mr. Hackney was also a salaried employee of Truck Haven during the years in issue. Mr. Hagaman, Bill, Jr., Mr. Daugherty, and Mr. Hackney all worked at the main office of Truck Haven. Thomas R. Crooks began working for Truck Haven in 1969. He became operations manager for Truck Haven in 1972 and remained in such position during the years in issue. As operations manager, he was responsible for overseeing all of the truck stop operations of Truck Haven. Mr. Crooks reported directly to Mr. Hagaman during the time he was employed by *549 Truck Haven. During the years in issue, Truck Haven was principally engaged in the business of operating the five truck stops in Tennessee. Each truck stop sold gasoline and other petroleum products at retail, operated repair shops and gift shops, and provided other services to truck drivers and motorists. Cigarette, pinball, and vending machines also were located on the premises of each truck stop. Each truck stop was open 24 hours a day, 7 days a week. Each truck stop had a general manager, several shift managers, and a bookkeeper. The general manager was responsible for supervising all the activities of the truck stop and periodically reported to Truck Haven management at the main office in Chattanooga. All of the truck stops were substantially independent of Truck Haven on a day-to-day basis. Mr. Hagaman rarely visited the truck stops. Each truck stop compiled daily reports of its sales and cash position (the daily sales reports). A daily sales report was a pre-printed form on which the truck stop bookkeeper recorded sales of gasoline, oil, truck parts, and gift items. Space was provided on such form for vending income earned by the truck stop. Each truck stop *550 also maintained its own bank account at a local bank and made its own deposits to such account. The daily sales reports and bank deposit receipts of each truck stop were sent periodically to Truck Haven's main office in Chattanooga. At the main office, the information contained on the daily sales reports was recorded in a receipts journal. Such entries were totalled monthly, and such total was posted to the corporate general ledger. The daily sales reports were also reconciled with the bank deposit receipts periodically. Sometime in the early 1970s, Mr. Hagaman began to divert to his own use income from the pinball and vending machines at the truck stops. In 1971, he told Jimmy Thatcher, the manager of the Knoxville truck stop, to deposit only half of the money removed from such machines into the bank and to report only half of such money on the daily sales reports of the truck stop. Mr. Thatcher was instructed to convert half of the coins from the vending machines into $ 100 bills and keep such currency in the truck stop office. Mr. Hagaman, and later Mr. Crooks, periodically visited the Knoxville truck stop to pick up the undeposited income. After a time, Mr. Hagaman instructed *551 Mr. Thatcher to turn over all of the vending income to him. After such time, Mr. Hagaman received between $ 2,000 and $ 4,000 per month of unreported income. James Cox became the manager of the Knoxville truck stop in 1974, and he remained its manager during the years in issue. During 1975 through 1978, there were two pinball machines and two cigarette machines located at the Knoxville truck stop. During such years, such machines were emptied of cash once a week. The cash from such machines was converted into large bills and kept in a safe in the truck stop office. Once a month, Mr. Crooks picked up a bag containing such cash on his usual visit to the Knoxville truck stop. On occasion, Mr. Cox carried the vending machine money to Truck Haven's main office himself. Truck Haven leased the pinball machines located at the Knoxville truck stop. The rent for such machines was paid before Mr. Crooks picked up the bag containing the vending income. On its daily sales reports for the years in issue, the Knoxville truck stop reported vending income of $ 3,456.75 in 1975 and $ 573.25 in 1976. It reported no vending income on such reports in 1977 and 1978. From 1974 until February *552 1977, Tony Ingram was the truck stop manager of the Lebanon truck stop. When Mr. Ingram took over as the manager of the Lebanon truck stop, he was briefed on how to handle the truck stop operations by Mr. Crooks and Mr. Cox, his predecessor at such truck stop. There were two pinball machines and two cigarette machines at the Lebanon truck stop. The plan for diverting income at such truck stop was similar to that in place at the Knoxville truck stop. Mr. Ingram did not deposit all the cash from such machines into the truck stop's bank account. Instead, he retained a portion of such cash and periodically gave such cash to Mr. Crooks. Mr. Ingram gave Mr. Crooks between $ 700 and $ 1,400 per month in cigarette machine income. There is no direct evidence in the record as to how much pinball machine income Mr. Crooks picked up each month. Only 10 percent of the revenue for the cigarette and pinball machines was entered on the truck stop daily sales report. The Lebanon truck stop also had a soft drink machine on its premises. All the receipts from such soft drink machine were deposited in the truck stop bank account and were entered on the truck stop daily sales reports. On *553 its daily sales reports, the Lebanon truck stop reported vending machine income from all sources of $ 12,697.65 in 1975, $ 14,255.23 in 1976, $ 12,450.70 in 1977, [2] and $ 5,823.86 in 1978. Luther Mason was the general manager of the Franklin truck stop from 1969 until 1974. During such time, there were cigarette machines, pinball machines, and other vending machines located at the truck stop. While Mr. Mason was the manager of the Franklin truck stop, he did not deposit all of the cash taken from such machines into the truck stop bank account. Instead, he retained a substantial portion of such cash and converted it into $ 10, $ 20, and $ 100 bills. Mr. Mason usually turned over such undeposited cash to Mr. Hagaman at the monthly meeting of truck stop managers. In some months, Mr. Hagaman came to the Franklin truck stop and picked up such cash personally. On Mr. Hagaman's *554 instructions, Mr. Mason kept $ 50 or $ 100 of the undeposited cash for himself. Mr. Mason left the Franklin truck stop in 1974 to become the manager of the Nashville truck stop. He was replaced as manager of the Franklin truck stop by Lloyd Smith. Mr. Smith did not testify at trial, and there is no direct evidence in the record of the diversion of vending machine income during the years in issue. The Franklin truck stop reported vending income of $ 11,617.99 in 1975, $ 8,001.93 in 1976, $ 5,263.60 in 1977, and $ 2,813.10 in 1978. The Nashville truck stop opened in 1974. Mr. Mason was the manager of such truck stop from 1974 until 1981. As manager, Mr. Mason made the truck stop's bank deposits. During the years in issue, there were two cigarette machines, three pinball machines, two soft drink machines, and one snack food vending machine at the Nashville truck stop. Such vending machines were periodically emptied of coins by Mr. Mason. He did not deposit all of the cash taken from such machines into the truck stop bank account. Instead, he kept a substantial portion of such cash and converted it into $ 10, $ 20, $ 50, and $ 100 bills. Such bills were kept in a safe in *555 the truck stop manager's office until it was delivered to Mr. Crooks. Upon Mr. Crooks' instructions, Mr. Mason kept $ 100 per month of the undeposited vending machine income for himself. On its daily sales reports, the Nashville truck stop reported vending machine income of $ 19,042.99 in 1975, $ 19,908.70 in 1976, $ 17,701.63 in 1977, and $ 7,094.73 in 1978. From 1974 until January 1976, Donald Badacour was the general manager at the Chattanooga truck stop. He was succeeded by Raymond Nelson, who worked in such capacity from 1976 until 1978. During the years in issue, Leon Britt was a shift manager at such truck stop. During the years in issue, there were two cigarette machines, two pinball machines, and other vending machines on the premises of the Chattanooga truck stop. Mr. Britt removed the cash from the cigarette and pinball machines twice a week. He then rolled the coins from such machines into $ 10 rolls and turned such rolls of coins over to the truck stop manager. While Mr. Badacour was general manager of the Chattanooga truck stop, he periodically filled the cigarette machines with packs of cigarettes. He also emptied the cigarette, pinball, and vending machines *556 of cash. Mr. Badacour put such cash into coin rolls, converted such rolls into paper money, and kept such paper money in a safe at the truck stop. The money was separated into different envelopes according to the type of vending machine from which it came. The envelopes containing the pinball and cigarette machine income had $ 50 and $ 100 bills in them. Once a month, Mr. Crooks visited the Chattanooga truck stop to pick up such envelopes. While Mr. Badacour was the manager of the Chattanooga truck stop, he kept 5 percent of the pinball machine revenue for himself. Such percent was computed after the rent on the pinball machines had been paid. Mr. Badacour also kept $ 100 per month of the cigarette machine revenue. He kept such income on the instructions of Mr. Crooks. On its daily sales reports, the Chattanooga truck stop reported no vending income in 1975 through 1978. Mr. Crooks periodically visited each truck stop to pick up the cash taken from the pinball and vending machines. About 4 to 6 weeks, he took such cash in a sack to Truck Haven's main office in Chattanooga. He walked with the sack past the receptionist's desk and back to the area where Mr. Hagaman's office *557 was located. When Mr. Crooks left the main office, he never had the sack with him. The Hagamans reported vending machine income on their Federal income tax returns of $ 7,179 in 1975, $ 5,916 in 1976, and $ 7,924 in 1977. They reported no income from vending machines in 1978. The Chattanooga truck stop rented space on its premises to several businesses, including a tire service company, a radio and television repair shop, and a trucking company. It received rent checks from such businesses totalling $ 5,400.00 in 1975, $ 21,487.80 in 1976, $ 26,820.00 in 1977, and $ 28,223.50 in 1978. Such checks were cashed by employees of the Chattanooga truck stop and the proceeds sent to Truck Haven's main office, along with the cash taken from the vending and pinball machines. On its daily sales reports for the years in issue, the Chattanooga truck stop reported rental income of $ 4,000 in 1976, $ 3,800 in 1977, and $ 5,500 in 1978. It reported no rental income on such reports in 1975. The Knoxville truck stop also rented space to several trucking companies. Such companies each paid rent of between $ 75 and $ 100 per month. Such rental checks were cashed by employees of the Knoxville *558 truck stop and placed in the safe at the truck stop, along with the vending and pinball machine revenue. Such rental payments were picked up by Mr. Crooks and taken to Truck Haven's main office. The rental income was not reported on the daily sales reports of the Knoxville truck stop during the years in issue. On August 5, 1974, Mr. Hagaman formed Edgemont of Atlanta, Inc. (Edgemont), to operate a motel and restaurant in Atlanta, Georgia. Mr. Hagaman owned all of the outstanding stock of Edgemont. As the sole shareholder of Edgemont, he executed a valid election under section 1372 to treat such corporation as a small business corporation for Federal income tax purposes. [3] Edgemont reported its income and expenses on a calendar year basis. *559 Mr. Hagaman made contributions to Edgemont's capital account of $ 58,000 in 1974 and $ 9,500 on or about December 30, 1975. In addition, he made a loan of $ 10,000 to the corporation in 1974. Edgemont sustained losses of $ 62,846 in 1974, $ 13,019 in 1975, $ 1,043 in 1976, and $ 437 in 1977. Mr. Hagaman received a distribution of $ 9,500 from Edgemont in January 1976. In 1976 and 1977, the corporation reported no gross income. During 1975 and 1976, homes were being constructed for Bill, Jr., and for Deborah and Phil Hackney. Mr. Hagaman employed Morgan Construction Company (Morgan Construction) to build the homes. During the course of construction, Larry Morgan, the owner of Morgan Construction, informed Mr. Daugherty of the hours worked by him and his construction crew. Mr. Morgan was directed to do so by Mr. Hagaman. Truck Haven then issued payroll checks to such individuals based on the hours reported by Mr. Morgan. Truck Haven treated such amounts as corporate operating expenses on its books and claimed such amounts as deductions on its 1975 and 1976 corporate Federal income tax returns. Such amounts were not included in the Forms W-2 issued to Bill, Jr., and Phil *560 Hackney for 1975 and 1976. Neither Bill, Jr., nor the Hackneys reported such amounts as income on the Federal income tax returns which they filed for such years. During 1975 and 1976, Truck Haven paid wages to individuals for work performed on the "Bilbon," a yacht owned by Mr. Hagaman. Such wages totalled $ 3,736.25 in 1975 and $ 1,185.00 in 1976. Truck Haven also paid premiums of $ 1,966.00 in 1975 for insurance coverage on such yacht. There is no evidence in the record as to the nature or extent of any business use of such yacht. In 1975, Truck Haven paid and deducted a total of $ 9,593 for legal and accounting expenses. Of such amount, $ 4,750 was paid to Arthur Anderson & Co. (Arthur Anderson), a certified public accounting firm. The invoice supporting such deduction was not offered as evidence at trial. Truck Haven employed Vernon Liston as its independent accountant during the years in issue. Mr. Liston prepared Truck Haven's tax returns during such years. He prepared such returns using accounting workpapers provided to him by Mr. Daugherty. Such workpapers were compiled from Truck Haven's receipts and disbursements journals and general ledger. Mr. Liston did *561 not examine any of the books and records of such corporation at the time he prepared the corporate tax returns. In August 1977, the Commissioner's agent, Alvero Castilla, began an investigation of the Hagamans' tax returns for 1975 and 1976. Shortly after he began his examination, Mr. Castilla expanded his inquiry to include the tax liabilities of Truck Haven. During the course of such examinations, he became concerned with the amount of vending machine income reported by the petitioners and by Truck Haven. Based on his prior experience, Mr. Castilla knew that businesses with vending machines usually generated a substantial amount of cash. He believed the amounts shown as vending machine income on the Federal income tax returns of the petitioners and of Truck Haven to be unreasonably low. In an attempt to determine the amount of vending income earned by Truck Haven, Mr. Castilla analyzed Truck Haven's cigarette sales and purchases during 1975 and 1976. He first determined the total cost of cigarette purchases made by the corporation during such years. From such amount, he determined the number of packs of cigarettes purchased by Truck Haven in such years. Finally, he multiplied *562 the number of packs purchased by the retail price per pack to arrive at the approximate amount of cigarette revenue that should have been reported on the Truck Haven returns examined by him. Based on such analysis, Mr. Castilla concluded that cigarette revenue was under-reported by all five of the truck stops operated by Truck Haven. In some of such truck stops, he determined that the purchases of cigarettes exceeded the amount of cigarette revenue reported by the truck stop from all sources. He determined that Truck Haven had received unreported cigarette revenue of $ 85,000 in 1975 and $ 100,000 in 1976. As a result of his examination, Mr. Castilla referred the examination of the Federal income tax returns of the petitioners and Truck Haven to the Criminal Investigation Division of the IRS in February 1978. The case was assigned to Special Agent William L. Parker in March 1978. Special Agent Parker conducted a criminal investigation of the tax liabilities of the petitioners and Truck Haven for 1975 and 1976. During the criminal investigation of the tax liabilities of the petitioners and of Truck Haven, Special Agent Parker reviewed the corporation's general ledgers, *563 sales journals, and bank account information. He also examined the daily sales reports of the truck stops for 1975 and 1976 and the workpapers which Mr. Liston used to prepare the corporate tax returns. Special Agent Parker used the "specific items" method of proof in conducting his criminal investigation. Under such method, the examining agent traces a specific item through the accounting records to determine if such item has been reported on a tax return. Special Agent Parker also relied on sworn statements taken from the truck stop managers at the Knoxville, Chattanooga, and Nashville truck stops to determine the amount of unreported vending machine income for such truck stops for 1975 and 1976. In such statements, the managers gave figures as to the minimum and maximum amounts of cash delivered to Truck Haven's main office. For purposes of the criminal investigation, Special Agent Parker used the minimum amount given by the truck stop managers in determining the amount of the unreported vending machine income at such truck stops. He was unable to secure sworn statements from the truck stop managers of the Lebanon and the Franklin truck stops. For such reason, he made an *564 analysis of the cigarette purchases by such truck stops during 1975 and 1976. He also made the same analysis of cigarette purchases by the Knoxville, Nashville, and Chattanooga truck stops, although he did not rely on such analysis in his determination. Rather, he used such analysis to corroborate the sworn statements of the managers of such truck stops. On June 7, 1982, the United States Attorney for the Eastern District of Tennessee filed an information charging Mr. Hagaman with two counts of violating section 7201 and two counts of violating section 7206(2) for 1975 and 1976. On the same day, Mr. Hagaman entered a plea of guilty to a single count of violating section 7201 in 1975. The United States District Court entered a judgment pursuant to Mr. Hagaman's guilty plea. Such judgment has become final. Mr. Castilla resigned from the IRS in August 1978. The joint criminal and civil investigation involving the petitioners and Truck Haven was then assigned to Lowrey Underwood. Mr. Underwood continued the joint investigation for 1975 and 1976. He also expanded his inquiry to include an examination of the petitioners' Federal income tax returns for 1977 and 1978 and an examination *565 of Truck Haven's Federal income tax returns for 1977 and 1978. Special Agent Parker's criminal investigation covered tax liabilities of the Hagamans and Truck Haven for 1975 and 1976. Mr. Underwood largely adopted Special Agent Parker's determinations for purposes of his civil examination. Mr. Underwood also determined that Truck Haven sold 1,005 additional cartons of cigarettes in 1975 and 142 additional cartons in 1976. In his investigation of the unreported cigarette income of 1977 and 1978, Mr. Underwood relied on schedules prepared by Mr. Liston, Truck Haven's independent accountant. Such schedules detailed the purchases of cigarettes made by all of the truck stops during 1977 and 1978. After sampling the underlying invoices of such cigarette purchases, Mr. Underwood accepted the accuracy of the schedules. In computing the unreported income from pinball machines for the years in issue, Mr. Underwood based his determinations on the statements of witnesses interviewed during his investigation. Such witnesses stated that, for the years in issue, the pinball machines generated more revenue than the cigarette machines. From such statements, he determined that the unreported *566 pinball revenue from the five truck stops operated by Truck Haven amounted to $ 132,000 per year for 1975 through 1978. In his notice of deficiency, the Commissioner determined that the petitioners diverted cigarette and pinball machine income to their own use in 1975 through 1978 and that such amounts constituted "dividend income under sections 301 and 316." He determined that the petitioners received income from cigarette machines of $ 120,995 in 1975, $ 122,705 in 1976, $ 125,106 in 1977, and $ 119,154 in 1978. He also determined that the petitioners received income from pinball machines of $ 60,000 per year for each year from 1975 through 1978. Such amount was a negotiated figure agreed to by Mr. Liston and a representative of the IRS at a conference. In his notice, the Commissioner gave the petitioners credit for the vending machine income which they reported on their 1975 through 1978 income tax returns. The Commissioner also determined that the rental payments received from the tenants at the Knoxville and the Chattanooga truck stops during 1975 through 1978 were directed to the benefit of the petitioners and consequently constituted dividend income to them in the year *567 received. He determined that such payments totalled $ 5,400 in 1975, $ 19,488 in 1976, $ 22,170 in 1977, and $ 28,590 in 1978. The Commissioner conceded at trial that the amount of unreported rental income for 1978 was overstated in the notice of deficiency by $ 5,600. In his notice of deficiency, the Commissioner also determined that the wages paid by Truck Haven to the construction workers who built the homes for the petitioners' two children and to the individuals who worked on the Bilbon, as well as the employment taxes attributable to such wages, constituted dividend income to the petitioners. Such wages and payroll taxes totalled $ 77,028 in 1975 and $ 91,400 in 1976. In addition, the Commissioner determined that $ 4,750 in legal expenses paid and deducted by Truck Haven in 1975 was a personal expense of Mr. Hagaman. For such reason, he determined that such amount constituted dividend income to the petitioners in 1975. The Commissioner also reduced the losses claimed on the petitioners' Federal income tax returns attributable to Edgemont by $ 7,865 for 1975 and disallowed in full losses of $ 1,043 claimed in 1976 and $ 437 claimed in 1977. In addition, the Commissioner *568 determined that the petitioners received $ 9,500 in interest income from Truck Haven in 1975 and failed to report such income on their Federal income tax return for such year. Finally, the Commissioner determined that the petitioners were liable for the addition to tax under section 6653(b) for 1975, 1976, 1977, and 1978. At trial, the Commissioner's counsel conceded that petitioner Bonnie C. Hagaman is not liable for such additions. OPINION The first issue for our decision is whether the petitioners received constructive dividends from Truck Haven in the amounts determined by the Commissioner. We will first consider the alleged diversion of vending machine and rental income from Truck Haven by the petitioners. The Hagamans first argue that the Commissioner failed to prove at trial that they received or had the benefit of any of the unreported income during the years in issue. On brief, the petitioners attack the credibility of the witnesses presented by the Commissioner by suggesting that such witnesses' testimony was tainted by self-interest, prejudice, or outright hostility toward them. At trial, the Court heard the testimony of a number of general managers, shift *569 managers, and bookkeepers who worked at the truck stops or at Truck Haven's main office during the years in issue. All but one of such witnesses gave consistent and detailed testimony with respect to how the vending machine cash was removed from such machines, stored at the truck stops, picked up by Mr. Crooks and taken to Truck Haven's headquarters. Only Mr. Nelson was unable to testify as to the procedure, stating that he could not recall the details. Mr. Crooks, the operations manager of Truck Haven, corroborated the others' testimony when he indicated that he visited each truck stop every 4 to 6 weeks, picked up the vending machine income of such truck stop, placed the cash in a sack, and brought the sack to the main office. Two employees who worked at the main office testified that Mr. Crooks carried the sack past the reception desk and back to the area where Mr. Hagaman's office was located. Such employees testified that when Mr. Crooks left the main office past the reception desk, he no longer had the sack with him. Although no witness stated that he had actually seen Mr. Hagaman receive the diverted income, we believe that the testimony presented constitutes strong circumstantial *570 evidence that such was the case. We therefore conclude that Mr. Hagaman did in fact receive vending machine and rental income diverted from the truck stops operated by Truck Haven during the years in issue. The petitioners next argue that the Commissioner erred in concluding that the daily sales reports of the truck stops were not the basic source documents used to prepare Truck Haven's tax returns. They claim that a "very substantial" amount of income which was not reflected on the daily sales reports was recorded on such corporation's general ledger and reported on its tax returns. The petitioners failed to introduce the corporate general ledger into evidence at trial. Therefore, we must look to other documentary evidence and the testimony of witnesses in considering the petitioners' argument. Mr. Daugherty, Truck Haven's controller, testified that the information contained on the daily sales reports was entered into a receipts journal, totalled monthly, and posted to Truck Haven's general ledger. Mr. Daugherty also indicated that he prepared worksheets from the receipts and disbursements journals and the general ledger and that such worksheets were used to prepare the *571 corporate tax returns. He stated that no substantial amount of income was reported on Truck Haven's tax returns which was not reported on the daily sales reports. Finally, he confirmed that the daily sales reports were in fact the basic source documents used to prepare the tax returns. Mr. Daugherty's testimony was corroborated by two of Truck Haven's bookkeepers. The Commissioner's agents examined all available information regarding Truck Haven's tax liabilities during their investigation. Special Agent Parker testified that he reviewed Truck Haven's accountant workpapers, general ledgers, receipts and disbursements journals, bank deposit receipts, and other records. Both of the Commissioner's revenue agents also reviewed the same records. The evidence shows that after a painstakingly complete investigation, all three agents concluded that both the corporation and the petitioners failed to report substantial amounts of income. We hold that the petitioners have failed in their burden of proving that the Commissioner's determinations, which were based upon such investigation, were erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; [4]Welch v. Helvering,290 U.S. 111 (1933). *572 We next consider whether the payments by Truck Haven for the cost of maintaining the Bilbon, for legal fees, and for the wages of the employees of Morgan Construction constituted constructive dividends to the petitioners. Expenditures by a corporation for the personal benefit of a shareholder may result in a constructive dividend to such shareholder. See, e.g., Ireland v. United States,621 F.2d 731 (5th Cir. 1980); Enoch v. Commissioner,57 T.C. 781 (1972); American Properties, Inc. v. Commissioner,28 T.C. 1100 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). In determining whether there has been a constructive dividend, "The crucial concept * * * is that the corporation conferred an economic benefit on the stockholder without expectation of repayment." United States v. Smith,418 F.2d 589, 593 (5th Cir. 1969). We must determine whether the corporate expenditure was made primarily to benefit Truck Haven's trade *573 or business or primarily for the personal benefit of the Hagamans. Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1215-1217 (5th Cir. 1978); United States v. Gotcher,401 F.2d 118, 121 (5th Cir. 1968); Larkin v. Commissioner,48 T.C. 629, 635 (1967), affd. 394 F.2d 494 (1st Cir. 1968). "Whether or not a corporation distribution is a dividend or something else, such as a gift, compensation for services, repayment of a loan, interest on a loan, or payment for property purchased, presents a question of fact to be determined in each case." Lengsfield v. Commissioner,241 F.2d 508, 510 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We first consider the treatment of the payments made by Truck Haven for the maintenance and insurance coverage on the Bilbon. The Commissioner determined that such corporation paid wages in 1975 and 1976 to individuals who performed work on such yacht and paid insurance premiums in 1975 for such yacht and that such amounts constituted dividend income to the petitioners. The Hagamans bear the burden of proving the Commissioner's determination to *574 be erroneous. Rule 142(a). The petitioners do not dispute that Truck Haven made the payments in question. However, they claim that the yacht was used by Mr. Hagaman to entertain business clients. They argue that for such reason the expense attributable to such business use should not be treated as constructive dividends to them. There is little evidence in the record to establish the nature and extent of any business use of the Bilbon. The petitioners offer only the testimony of Mr. Hagaman, in which he stated that such yacht was used to entertain customers on "several occasions." We conclude that such testimony is too general and vague to establish that any expense was incurred primarily to benefit Truck Haven's trade or business and thus should not be deemed constructive dividends. For such reason, we hold that the petitioners have failed to meet their burden of proof with respect to this item. [5]
The Commissioner also determined that a portion of the legal expenses paid to Arthur Anderson by Truck Haven in 1975 was in fact a personal expense of Mr. Hagaman and constituted dividend income *575 to the petitioners in such year. Mr. Liston, the independent accountant for Truck Haven, testified that Arthur Anderson performed "tax advice and accounting services [and] * * * was paid by the company in 1975." Other witnesses indicated that Arthur Anderson prepared the corporate income tax returns of Truck Haven for such year. The petitioners urge that this testimony is sufficient to establish that the expense was incurred to benefit the corporation. The Hagamans failed to produce at trial the invoice from Arthur Anderson, or any other documentary evidence, to explain the nature of the services performed by such firm. We observe that none of the Truck Haven corporate income tax returns contained in the record was signed by representatives of Arthur Anderson. In fact, all such returns after 1974 were prepared and signed by Mr. Liston, who was not associated with Arthur Anderson. We are not persuaded by the testimony offered by the petitioners as to the services provided by Arthur Anderson and hold that they have failed in their burden of proving the Commissioner's determination to be erroneous. We next consider whether the wages paid by Truck Haven to the workers at Morgan *576 Construction who constructed homes for Bill, Jr., and the Hackneys constituted constructive dividends to the Hagamans. In general, distributions of corporate funds to the children of controlling shareholders will be deemed to be constructive dividends to such shareholders, absent a showing that the payments were made for bona fide business purposes and were not due to family considerations. See Engineering Sales, Inc. v. United States,510 F.2d 565, 569-570 (5th Cir. 1975); 58th St. Plaza Theatre, Inc. v. Commissioner,195 F.2d 724, 725 (2d Cir. 1952), affg. 16 T.C. 469 (1951). [6]
The petitioners argue that since Bill, Jr., and Mr. Hackney were both salaried employees of Truck Haven, the payments were in fact either compensation for services or loans to such employees. However, there is no evidence in the record to support such a claim. Mr. Hagaman failed to instruct Truck Haven's bookkeepers to record the payments in other than an ordinary manner. Consequently, *577 Truck Haven treated the payments on its books and on its tax returns as corporate operating expenses. The Forms W-2 issued to Bill, Jr., and Mr. Hackney for 1975 and 1976 did not reflect such amounts as wages. There is no indication that such individuals signed notes evidencing their debt to the corporation or made any arrangements to repay such amounts. Finally, the petitioners have made no attempt to show any business purpose which might be served by such payments. For such reasons, we conclude that the petitioners have failed to prove that the Commissioner's determination that such payments were constructive dividends to them was erroneous. The petitioners next claim that the income which they diverted and the payments made by Truck Haven on their behalf do not constitute dividend income to them since such corporation lacked sufficient earnings and profits to cover the distributions made to them in 1976 and in the short tax year ended June 30, 1977.
In general, section 301 provides that a distribution of property made by a corporation to a shareholder with respect to its stock shall *578 be included in such shareholder's gross income to the extent such distribution is a dividend under section 316. Sec. 301(a), (c). Section 316(a) provides that a dividend shall be any distribution of property made by a corporation to its shareholders out of earnings and profits accumulated after February 28, 1913, or out of earnings and profits of the current taxable year, computed as of the close of the taxable year and without regard to the amount of earnings and profits at the time the distribution was made. Any distribution of property in excess of earnings and profits is applied first to reduce the shareholder's adjusted basis of his stock. Sec. 301(c)(2). Any remaining amount is treated as gain from the sale or exchange of property. Sec. 301(c)(3)(A). The parties agree that Truck Haven had current earnings and profits of $ 198,635 in 1975, $ 1,035,471 in the short year from July 1 to December 31, 1977, and $ 138,671 in 1978. They also agree that there was a deficit in current earnings and profits in 1976 and in the short year ended June 30, 1977. During his investigation of Truck Haven, the Commissioner's agent, Mr. Underwood, determined that Mr. Hagaman began to divert *579 corporate receipts to his own use in the late 1960s or early 1970s. After interviewing truck stop managers and making his own analysis, he calculated that such corporation had under-reported its income by a total of $ 550,000 from 1971 through 1974. For such reason, Mr. Underwood increased Truck Haven's accumulated earnings and profits as of December 31, 1974, by $ 550,000 to correct for such unreported income. The parties agree that, without such adjustments, Truck Haven had $ 334,109 in accumulated earnings and profits as of December 31, 1974. The petitioners argue that the $ 550,000 increase was arbitrary and designed to "manufacture" corporate earnings and profits. They bear the burden of proving that Truck Haven's earnings and profits were insufficient to cover the diverted income received by them. Fein-Marquart Associates, Inc. v. Commissioner,T.C. Memo. 1985-288; DiZenzo v. Commissioner,T.C. Memo. 1966-16. We recognize that the Commissioner did not conduct a formal examination of Truck Haven's tax liabilities for 1971 through 1974. However, Mr. Underwood's investigation revealed that such corporation failed to report substantial *580 amounts of vending machine income earned by the truck stops during those years. We believe that it was appropriate to act upon such evidence by adjusting the accumulated earnings and profits balance as of December 31, 1974. His conclusion was based on the sworn statements of Truck Haven employees and on his own careful analysis of cigarette purchases by such corporation. In our view, the increase calculated by him was reasonable under the circumstances. The petitioners presented no evidence to refute the amounts determined by the Commissioner. For such reason, we conclude that they have failed in their burden of proving that Truck Haven had insufficient earnings and profits to cover the distributions from such corporation. Therefore, we hold that they had dividend income in the years in issue in the amounts determined by the Commissioner. The next issue for our decision is whether the petitioners are entitled to losses attributable to Edgemont claimed by them in 1975, 1976, and 1977. The net operating losses of a small business corporation are generally passed through to the shareholders *581 of such corporation. Sec. 1374(a). However, the net operating loss which may be deducted by a shareholder for any taxable year cannot exceed the sum of the shareholder's adjusted basis of stock in the corporation and the adjusted basis of any indebtedness of the corporation to the shareholder. Sec. 1374(c)(2). Such amounts are determined as of the end of the corporation's tax year. Sec. 1374(c)(2). During his examination, the Commissioner's agent found that Mr. Hagaman contributed $ 9,500 to the capital of Edgemont on or about December 30, 1975, and received a distribution from such corporation in the same amount in January 1976. The agent characterized such transaction as a sham and did not include the $ 9,500 payment in the petitioners' basis for their Edgemont stock. Without such contribution, the petitioners' basis was insufficient to absorb the losses which Edgemont incurred for 1975 through 1977. We have held that Congress intended to limit the losses which may be claimed by a shareholder in a small business corporation to the actual economic outlay of the shareholder in question. *582 Pike v. Commissioner,78 T.C. 822, 830 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984); Perry v. Commissioner,54 T.C. 1293, 1296 (1970). Since Mr. Hagaman's contribution to Edgemont was withdrawn from such corporation only a few days after the close of its tax year, the flurry of transactions left him no evidence to show that the contribution and subsequent withdrawal had a bona fide business purpose and left Mr. Hagaman economically impaired. Thus, we conclude that the contribution was without economic substance and is not to be given effect for tax purposes. For such reason, the Hagamans are not entitled to the losses attributable to Edgemont claimed by them in excess of the amounts allowed by the Commissioner. See Pike v. Commissioner, supra;Hodge v. Commissioner,T.C. Memo. 1970-280. The next issue for our decision is whether the petitioners received $ 9,500 in 1975 which they must report as income in such year. In his notice of deficiency, the Commissioner determined that the petitioners received such amount as an interest payment from Truck Haven. However, at trial, *583 the Commissioner's agent testified that during his examination he discovered a check to Mr. Hagaman for $ 9,500 which he believed came not from Truck Haven, but from Edgemont. Such check is not contained in the record. The petitioners do not dispute that they received a $ 9,500 check in 1975. However, they disagree with the Commissioner's treatment of such check. They argue that Mr. Hagaman did not make loans to either Truck Haven or Edgemont large enough to support an interest payment of $ 9,500. They suggest that such payment instead represented a distribution of capital from Edgemont. We agree with the petitioners with respect to this item. The Commissioner's own examining agent testified that he believed the check came from Edgemont. Further, the Edgemont balance sheet contained in such corporation's Federal income tax return for 1975 shows a loan from Mr. Hagaman of only $ 10,000. The balance sheet contained in the Federal income tax return filed by Truck Haven for 1975 does not show any loans from stockholders at all. Finally, we have found as a fact that Edgemont distributed $ 9,500 from its capital account to Mr. Hagaman in the first week of January 1976. We *584 believe that the fact that such distribution and the alleged interest payment are of an identical amount is more than coincidental. Rather, it is likely that the check discovered by the examining agent is the distribution from Edgemont. For such reasons, we hold that the petitioners have sustained their burden of proving the Commissioner's determination is erroneous with respect to this item and that the $ 9,500 payment is not includable in their income in 1975. The final issue for decision is whether petitioner William Hagaman is liable for the addition to tax for fraud under section 6653(b) for 1975, 1976, 1977, and 1978. Section 6653(b) provides that if any part of an underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of an underpayment for each year is due to fraud. Sec. 7454(a); Rule 142(b). To establish fraud, the Commissioner must show that Mr. Hagaman intended to evade taxes which *585 he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968). In 1982, Mr. Hagaman entered a guilty plea to a charge under section 7201 of attempting to evade or defeat Federal income tax for 1975. Such a plea is binding on Mr. Hagaman and estops him from denying that he filed a false tax return for 1975 with the intent to evade and prevent the collection of Federal income taxes due and owing by him in such year. See e.g., Amos v. Commissioner,360 F.2d 358, 359 (4th Cir. 1965), affg. 43 T.C. 50 (1964); Tomlinson v. Lefkowitz,334 F.2d 262, 266 (5th Cir. 1964); Strachan v. Commissioner,48 T.C. 335, 339 (1967). For such reason, and since underpayments of tax for all years have clearly and convincingly been shown, we hold that Mr. Hagaman is liable for the addition to tax under section 6653(b) for 1975. As to the years 1976 through 1978, the existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), *586 affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, but rather must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Since direct evidence of fraud is rarely available, circumstantial evidence may be considered. Spies v. United States,317 U.S. 492, 499 (1943); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Fraud may properly be inferred where an entire course of conduct establishes the requisite intent. Rowlee v. Commissioner, supra.
Our conclusion must be reached after considering all the facts and circumstances surrounding the conduct of Mr. Hagaman's business, the transactions which gave rise to the unreported income, and the preparation of the tax returns. See, e.g., Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969); Papineau v. Commissioner,28 T.C. 54, 57-58 (1957). After careful consideration of the record before *587 us, we conclude that the Commissioner has met his burden of proving that Mr. Hagaman is liable for the addition to tax for fraud for 1976, 1977, and 1978. We have found that Mr. Hagaman diverted to his own use pinball and cigarette machine income and rental income earned by the truck stops during the years in issue. He initiated the diversion plan, instructed Mr. Crooks and the managers of the truck stops as to its operation, and periodically received the diverted income. Such conduct is plain evidence of fraudulent intent to evade taxes. United States v. Thetford,676 F.2d 170, 175 (5th Cir. 1982). He failed to report substantial amounts of such diverted income for at least the 4 years in issue. Such a consistent pattern of under-reporting income is also persuasive evidence of fraud. Holland V. United States,348 U.S. 121, 139 (1954); Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). The diversion of income plan involved the manipulation of large amounts of cash. Mr. Hagaman's scheme called for employees of the truck stops to convert the coins *588 taken from the vending machines into large bills, which were eventually turned over to Mr. Crooks, or delivered to Truck Haven's main office. Such surreptitious cash transactions are classic indicia of fraud. Spies v. United States,317 U.S. 492 (1943); United States v. Daniels,617 F.2d 146, 150 (5th Cir. 1980); United States v. Skalicky,615 F.2d 1117, 1120 (5th Cir. 1980). Mr. Hagaman is obviously an intelligent and successful businessman. He must have known that the diverted income should have been reported on either his personal or Truck Haven's tax returns. We hold that failing to report such income was fraudulent and that Mr. Hagaman is liable for the addition to tax for fraud under section 6653(b) for 1975, 1976, 1977, and 1978. See Commissioner v. Smith,285 F.2d 91, 98 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Romm v. Commissioner,245 F.2d 730, 734 (4th Cir. 1957), affg. a Memorandum Opinion of this Court. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. The daily sales reports of the Lebanon truck stop for 1977 contained in the record show vending machine income of $ 12,450.70 for such year. However, since the reports for August 1977 are not in evidence, it is likely that vending machine income reported in such year is higher than such amount. ↩
3. The parties stipulated that Truck Haven purchased Edgemont from Mr. Hagaman in Dec. 1974. However, there is no indication on Edgemont's Federal income tax returns or elsewhere in the record of such a change in ownership. Further, if Truck Haven had purchased any Edgemont shares from Mr. Hagaman, Edgemont's status as a small business corporation would have been terminated. Sec. 1372(e)(3). For such reasons, we find that Mr. Hagaman owned all the outstanding shares of Edgemont during the years in issue. ↩
4. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure. ↩
5. See Von Hessert v. Commissioner,T.C. Memo. 1961-226↩. 6. See also Snyder v. Commissioner,T.C. Memo. 1983-692↩.