WILLIAM S. HAGAMAN AND BONNIE C. HAGAMAN, Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent
Hagaman v. Commissioner
Docket No. 747-85
United States Tax Court
T.C. Memo 1990-655; 1990 Tax Ct. Memo LEXIS 730; 60 T.C.M. (CCH) 1525; T.C.M. (RIA) 90655; December 31, 1990, Filed Andrew D. Lewis and Dave R. Prickett, for the petitioner Bonnie C. Hagaman. Roslyn D. Grand, for the respondent. DAWSON, Judge. PANUTHOS, Special Trial Judge. DAWSON
*2180 MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge Peter J. Panuthos pursuant to section 7443A(b) and Rules 180, 181, and 183. [1] The Court agrees with and adopts his opinion, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PANUTHOS, Special Trial Judge: This case came before the Court for further trial upon the granting of petitioner Bonnie C. Hagaman's [2] motion for reconsideration and retrial. Our initial opinion in this case is found at Hagaman v. Commissioner, T.C. Memo. 1987-549. The question *733 considered here is limited [3] to whether petitioner is an "innocent spouse" as that term is defined by section 6013(e) of the Internal Revenue Code of 1954 for the years in question. In deciding whether petitioner is an innocent spouse, we must consider the extent to which, if at all, she is bound by stipulations previously entered by counsel. *734 Procedural History
Respondent issued a statutory notice of deficiency on October 10, 1984, to petitioner and Mr. Hagaman determining deficiencies and additions to tax for taxable years 1975 through 1978. A petition for redetermination was filed with this Court on January 10, 1985 and the case was tried in November 1985. Prior to trial, stipulations were entered pursuant to Rule 91. Included in these were stipulations of fact concerning petitioner's role as a shareholder in Hagaman's Truck Haven, Inc. (Truck Haven), a corporation controlled by her then-husband, William S. Hagaman: 14. On September 24, 1969, two new truck stops were incorporated. One of these truck stops near Lebanon, Tennessee, was known as Hagaman Truck Harbor, Inc. The second of these truck stops was located near Franklin, Tennessee, and was known as Hagaman Truck Huddle, Inc. Bonnie C. Hagaman purchased the stock of the two corporations and became the sole stockholder of each of the corporations. Both of these locations were leased from Union 76 Oil Company. 15. Mrs. Hagaman, rather than Mr. Hagaman, purchased the stock of Hagaman Truck Harbor,Inc. and Hagaman Truck Huddle, *735 Inc. for several reasons. At the time that the two corporations were established, [Mr.] Hagaman intended to place all of his truck stop operations under a single corporate entity. Because [Mr.] Hagaman's companies were already indebted to various bonding companies and creditors, there was an advantage to having Mrs. Hagaman own the two truck stops. [Mr.] Hagaman, however, was actively involved in the business operations of *2181 Hagaman Truck Harbor, Inc. and Hagaman Truck Huddle, Inc. 20. Effective January 1, 1975, a statutory merger occurred between Hagaman Truck Haven, Inc. as survivor, Hagaman Truck Harbor, Inc. and Hagaman Truck Huddle, Inc. Prior to the merger all outstanding stock of Hagaman Truck Haven, Inc. was owned by William S. Hagaman. Prior to the merger, all outstanding stock of Hagaman Truck Huddle, Inc., was owned by Bonnie C. Hagaman. Prior to the merger, all outstanding stock of Hagaman Truck Harbor, Inc. was owned by Bonnie C. Hagaman. Upon the effectiveness of the merger all of the stock of Hagaman Truck Haven, Inc. was owned by William S. Hagaman and his wife Bonnie C. Hagaman. In June, 1977, Hagaman Truck Haven, Inc., Hagaman Restaurants, Inc. *736 , and Superior Trucking Service, Inc. entered into a statutory merger with the surviving corporation being Superior Trucking Services, Inc. Immediately thereafter, Superior Trucking Service, Inc. changed its name to Hagaman Truck Haven, Inc. In our opinion filed October 27, 1987, we found that Mr. Hagaman "skimmed" cash from vending machines located at the several truck stops operated by Truck Haven, and from Truck Haven's rental operations. We further found, based on stipulated facts, that "After the merger (of various smaller corporations), all of the stock of Truck Haven was owned by Mr. and Mrs. Hagaman." We went on to conclude that "they [Mr. and Mrs. Hagaman] had dividend income in the years in issue in the amounts determined by the Commissioner." These amounts consisted of certain expenses paid by the corporation for the construction of homes for their adult children and spouses, expenses relating to a yacht owed solely by Mr. Hagaman also paid by Truck Haven, as well as the Truck Haven income appropriated by Mr. Hagaman and not reported. No unreported income was attributed to activities of petitioner. Hagaman v. Commissioner, T.C. Memo. 1987-549. *737 A motion for reconsideration, raising arguments not pertinent to our inquiry herein, was filed on November 27, 1987. It was denied December 7, 1987. On January 15, 1988, and prior to the entry of this Court's decision, petitioner filed a petition for voluntary bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Tennessee. This Court's decision, subsequently entered on May 3, 1988, redetermined the following deficiencies and additions to tax owed by petitioner and Mr. Hagaman, except that additions to tax for fraud were solely the liability of Mr. Hagaman: Year
Deficiency
Addition to Tax Sec. 6653(b)
1975
$ 184,453
$ 92,226
1976
199,079
99,539
1977
137,029
68,514
1978
140,937
70,468
Totals
$ 661,498
$ 330,747
Respondent filed a claim for the tax deficiency and accrued interest in petitioner's bankruptcy proceeding, to which petitioner objected on June 28, 1988. On July 26, 1988, petitioner filed with this Court a Motion to Vacate Decision and a Motion for Leave to File Motion to Vacate Decision Out of Time. Petitioner argued that, as to her, the decision *738 entered by the Tax Court on May 3, 1988, was in violation of the automatic stay under 11 U.S.C. sec. 362(a)(8) (1988). The Motion for Leave to File was granted on July 28, 1988. On December 1, 1988, the bankruptcy court entered an order lifting the automatic stay to allow petitioner an opportunity to apply to this Court for reconsideration. Petitioner filed her Motion for Reconsideration, to which respondent did not object. Our order, issued March 16, 1989, granted petitioner's motion to vacate decision, granted petitioner's Motion for Reconsideration and New Trial, and ordered that the agreed computation for entry of decision filed May 3, 1988, be recharacterized as a "Stipulation Between Petitioner William S. Hagaman and Respondent." Based on the foregoing, a further trial was held to decide whether petitioner is an innocent spouse as defined by section 6013(e). FINDINGS OF FACT Petitioner and Mr. Hagaman were high school sweethearts. After graduation from high school in 1942, Mr. Hagaman joined the Army as a Second Lieutenant in the Army Transportation Corps. He was stationed in Louisiana where he and petitioner married in December 1944. While *739 Mr. Hagaman was stationed in Louisiana, petitioner worked at a manufacturing plant for the Army. Prior to her marriage, she worked at the Tennessee Valley Authority Maps and Survey Division Reproduction Unit in Chattanooga, Tennessee, her hometown. Mr. Hagaman was subsequently transferred to California and, later, sent overseas. Petitioner travelled to California to be with Mr. Hagaman, but returned to Chattanooga after his departure for overseas duty. She hoped to return to the job she previously held with the TVA, but found it filled by men who had returned from World War II. She persevered and was able to secure employment with a telephone company. During the time Mr. Hagaman was overseas, some 15 months, petitioner worked for the telephone company as a clerk in *2182 the sales office. Petitioner saved the $ 100 monthly allowance provided by Mr. Hagaman from his Army salary so that, by his return, she had accumulated $ 1,500. The couple used these funds to make the downpayment on a small home. When he returned to the United States, Mr. Hagaman became employed by Central Motor Express. With his income, petitioner and Mr. Hagaman could afford an automobile. Petitioner secured *740 employment as a salesperson in a furniture store but was forced to resign after a short time due to pregnancy. Their daughter ("Debbie Hackney") was born in October 1947. The Hagamans also had a son ("Bill, Jr.") in 1950. Petitioner never resumed employment or continued her education, but devoted her time to rearing her two children and managing the household on a full-time basis while Mr. Hagaman developed his own businesses. She relied solely upon her husband for support. Mr. Hagaman continued to be employed with freight companies in a managerial capacity until the time at which he acquired his own freight lines. He formed Superior Trucking Service which he operated while working for another freight company. Within a year, Mr. Hagaman left employment to concentrate his efforts on Superior Trucking Service. He later formed Superior Development Company for the purpose of building and leasing freight terminals. These business ventures were financially successful. In 1961, petitioner and Mr. Hagaman moved to a two-story stone house on Lookout Mountain, a fashionable area in Chattanooga, Tennessee. They made a $ 30,000 downpayment on the home, which cost $ 125,000, and financed *741 the balance over 15 years. The Lookout Mountain home was retitled in petitioner's sole name in 1973, and petitioner currently resides there. After they purchased the Lookout Mountain home, petitioner and Mr. Hagaman acquired other valuable assets. In 1966, they purchased property from Pure Oil Company, which was to be the site of Mr. Hagaman's Chattanooga, Tennessee truck stop. Mr. Hagaman also gave petitioner expensive gifts, including jewelry and automobiles. Prior to 1975, petitioner and Mr. Hagaman had acquired substantial assets and a quality lifestyle. Petitioner worked in the home while Mr. Hagaman worked at his job and, later, with his businesses. Mr. Hagaman handled all the family's finances except the household checking account, for which petitioner was responsible. The primary source of funds in the checking account was Mr. Hagaman's payroll checks. Taxes were withheld from the checks, and the amounts of the checks were included on joint returns filed by petitioner and Mr. Hagaman. Petitioner kept detailed records of the deposits into and checks written on the household checking account. On rare occasions, Mr. Hagaman asked petitioner for a blank check or deposit *742 slip. If petitioner furnished him with a deposit slip, Mr. Hagaman always returned the bank receipt with a notation identifying the source of the deposited funds. Indicated sources included various Hagaman companies, the Hackneys, and the family savings account. [4] There was nothing unusual about these sources. Where Mr. Hagaman deposited funds attributed to a Hagaman company, he wrote a check made payable to that company in the same amount. The amount of money deposited in the household checking account during the years in question was consistent with total deposits from previous years. The source of these funds likewise did not change during the years in question. Petitioner did not spend a significantly increased amount of money during those years; rather, the amounts fell within a consistent pattern of expenditures. Petitioner was able to make ends meet on the funds deposited in the household *743 account and did not spend more than the after-tax income reported on the annual returns. Often times, the after-tax income reported on the joint returns greatly exceeded the amounts expended from the household checking account. Petitioner paid routine bills and household expenses from the checking account. These bills and expenses included the house mortgage payments, payment of credit card bills, and grocery bills. In 1975 and later, petitioner and Mr. Hagaman wrote checks to assist their daughter, Debbie, with the construction of a new home. To cover these checks, Mr. Hagaman withdrew funds from the savings account and deposited them in the checking account. Petitioner was unaware that Truck Haven made other payments directly with respect to the houses for her daughter and for her son, Bill, Jr. Petitioner has a high school level education with no bookkeeping training or experience. Although she was responsible for the household account and payment of routine expenses, she did not participate in the preparation of annual income tax returns. Instead, she relied upon Mr. Hagaman and the services of accountants retained by him to do so. She signed the returns when Mr. Hagaman *744 proffered them to her for signature, without having reviewed them for accuracy. *2183 Petitioner was never employed by the businesses owned by Mr. Hagaman nor was she involved in their management. [5] Mr. Hagaman did not discuss the details of corporate management with her. Mr. Hagaman, as Truck Haven's controlling shareholder, sometimes named petitioner as a director or officer of Truck Haven. However, petitioner was unaware of her appointments in this regard and she did not attend corporate meetings. She was not privy to communications between Mr. Hagaman and his associates regarding the roundabout manner in which cash income was removed from Truck Haven's truck stops and delivered to Mr. Hagaman. Mr. Hagaman never told petitioner about the scheme to skim funds from the corporation and petitioner was unaware of its existence. Truck Haven corporate records do not indicate that stock was issued to *745 petitioner. Petitioner did not exercise any control over the operations of Truck Haven, or of Hagaman Truck Harbor, Inc., and Hagaman Truck Huddle, Inc. [6] She did not receive any benefit associated with stock ownership. Instead, Mr. Hagaman operated all Hagaman corporations as he saw fit. Mr. Hagaman intended to merge all Hagaman corporations into Truck Haven. Although petitioner signed a memorandum of merger relating to the merger of Truck Harbor and Truck Huddle into Truck Haven, she did not sign any other documents relating to the merger, including the articles of merger. Petitioner willingly signed any document which Mr. Hagaman brought to the Hagaman residence for her signature without first reviewing it. *746 While petitioner and Mr. Hagaman enjoyed many good years of marriage, their relationship suffered in 1975 when Mr. Hagaman became involved in an extra-marital affair. He did not make gifts to petitioner after that time, with the exception of a diamond ring on her 50th birthday in 1975 and a few small items. However, he did make cash gifts to his mistress and did purchase expensive gifts for her, including furs, jewelry, and a house in Florida. Mr. Hagaman became distant from his wife and infrequently communicated with her. He continued not to discuss his business activities with her. From 1975 through 1978, petitioner and Mr. Hagaman had an "on again, off again" relationship. Mr. Hagaman arranged for a legal separation in 1978 but petitioner refused to sign the documents hoping that the problems between herself and Mr. Hagaman could be resolved. In 1979, Mr. Hagaman was hospitalized for surgery. Petitioner stayed with her husband in the hospital until he told her to leave. Following his release from the hospital, Mr. Hagaman stayed at the Lookout Mountain home where petitioner nursed him to health. When he was able, Mr. Hagaman abandoned petitioner. In December 1979, *747 petitioner and Mr. Hagaman were legally separated, and Mr. Hagaman moved into a separate residence. In 1980, Mr. Hagaman purchased a house where he cohabited with his mistress. In 1983, Mr. Hagaman requested a divorce from petitioner. Petitioner retained counsel to represent her in January 1984, and the case was litigated in March 1987. The Chancery Court of Hamilton County, Tennessee, granted petitioner's complaint for divorce on April 1, 1987, and awarded her the following properties: Fair Market
Item
Value
Lookout Mountain Residence
$ 425,000
Jewelry
75,000
Household Furnishings, silver, crystal
and furs
25,600
Cash in bank account
9,297
Rossville Bank Certificate of Deposit
50,000
Cash value of Life Insurance owned by
Mrs. Hagaman
30,609
Property at 2800 South Market Street,
Chattanooga, TN
320,000
Warehouse property in Birmingham, AL
370,000
Lump sum cash payment by Mr. Hagaman
12,400
Total
$ 1,317,906
In addition, petitioner retained joint ownership of the Knox County property, an interest which had a value of approximately $ 350,000. The *748 Tennessee court noted that Mr. Hagaman was the sole shareholder of Hagaman's Truck Haven. Prior Tax Proceedings
Petitioner was not contacted by respondent's agents with respect to the criminal investigation [7] or with respect to the civil examination of Mr. Hagaman or Truck Haven. Following receipt of the joint deficiency notice at Truck Haven's corporate address, Mr. Hagaman retained Mr. William Frantz of Atlanta, Georgia, to represent himself and, ostensibly, petitioner *2184 before this Court. When the petition for redetermination was filed, petitioner and Mr. Hagaman were legally separated. On at least one occasion, Mr. Frantz discussed the tax proceeding with counsel representing petitioner. However, petitioner never met Mr. Frantz, and neither Mr. Frantz nor his assistants communicated with petitioner regarding the accuracy of proposed stipulations, the defenses possibly available to her, or any aspect of the litigation. Petitioner was not aware of the details of the proceedings in this Court, and she did not attend or participate in any way in the trial held in 1985. The innocent spouse defense was not raised on her behalf. *749 Petitioner's first communication with Mr. Frantz was in December 1987, when she received in the mail a copy of the Court's report (T.C. Memo. 1987-549) in which the litigated issues were decided largely against herself and Mr. Hagaman. Shortly thereafter, she filed a petition with the bankruptcy court. In proceedings before it, the bankruptcy court noted that petitioner could return to that court to argue substantive tax issues and any defenses against liability if she were unable to secure reconsideration of her tax liability in this Court. With regard to petitioner's position and the Government's motion to annul stay, the bankruptcy court stated: Mrs. Hagaman is in the position of a taxpayer who has had an opinion put down by the tax court but no judgment, since the judgment is void as to her because [it was] entered in violation of the automatic stay. Giving effect to the judgment could prejudice Mrs. Hagaman's request for a trial in the tax court. Later, on the joint motion of petitioner and the United States, the bankruptcy court was asked to modify the automatic stay to permit petitioner to file a motion for reconsideration with this Court. On *750 December 1, 1988, the bankruptcy court ordered that if the United States Tax Court agrees to hear the motion for reconsideration and grants a trial on the merits as to whether the debtor should be relieved of the said liability by reason of 26 U.S.C. Section 6013(e) or, alternatively, by reason of 26 U.S.C. Section 6013(e) and the statute of limitations, the automatic stay would be modified so as to permit a determination on the merits and thereafter entry of a final decision by the United States Tax Court on the merits as to whether the debtor is liable for the income tax deficiencies in issue * * *. OPINION Respondent argues that petitioner did not establish the elements necessary for innocent spouse relief under section 6013(e). He maintains that petitioner is bound by certain stipulated facts which, if true, prevent her from satisfying the statutory requirements. Respondent asserts that this Court lacks jurisdiction to reconsider the stipulated facts, namely, whether petitioner is a shareholder in Truck Haven. We disagree. For reasons expressed in the following discussion, we conclude that petitioner *751 is entitled to innocent spouse relief and thus she is not liable for deficiencies as determined and interest as computed by respondent. Respondent conceded in the prior proceeding that petitioner is not liable for the additions to tax. Section 6013(a) provides that a husband and wife may make a single return jointly of their income for the taxable year. Where a joint return is filed, liability with respect to the tax is joint and several. Sec. 6013(d)(3). A spouse may be relieved of this liability where the conditions set forth in section 6013(e)(1) are satisfied. To obtain relief under section 6013(e), the taxpayer asserting innocent spouse status must prove: -- joint returns were made for each year in issue; -- there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on each return; -- the spouse desiring relief did not know, and had no reason to know, of such substantial understatement when signing each return; and -- taking into account all the facts and circumstances, it is inequitable to hold the spouse *752 seeking relief liable for the deficiency attributable to such substantial understatement. Sec. 6013(e)(1). Petitioner bears the burden of establishing each of these elements. Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), affg. on this issue a Memorandum Opinion of this Court; Bokum v. Commissioner, 94 T.C. 126, 138 (1990). The requirements of section 6013(e) are conjunctive rather than alternative; the failure to meet any requirement precludes an individual from qualifying as an innocent spouse. Estate of Jackson v. Commissioner, 72 T.C. 356, 362 (1979); Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986). Respondent does not contest that petitioner filed joint returns with Mr. Hagaman for years 1975 though 1978, inclusive. Therefore, the first factor under section 6013(e)(1) is established. With respect to the second test under section 6013(e)(1), the amount of tax understatement well exceeds the statutory $ 500 minimum. Sec. 6013(e)(3). Thus, the first part of this test is satisfied. The understatement amount must also *2185 be attributable *753 to the spouse not seeking relief under this section. Since respondent maintains that petitioner received constructive dividends from Truck Haven, whether the understatement is attributable to items of the other spouse (Mr. Hagaman) is disputed. The last two requirements for innocent spouse relief are likewise contested. Substantial understatement of tax attributable to grossly erroneous items of the other spouse
We consider the factual issue of whether petitioner is a shareholder in Truck Haven in conjunction with our determination of whether the requirement contained in section 6013(e)(1)(B) is present. [8] If petitioner was a shareholder in Truck Haven, she may be deemed to have received constructive dividends and her tax liability is primary. If she received constructive dividends, that portion of the substantial understatement of tax is not attributable to grossly erroneous items of the other spouse and, to that extent, petitioner cannot be an innocent spouse. Thus, resolution of this question in favor of respondent would render innocent spouse status partially, if not totally, unavailable to petitioner. *754 (1) The Prior Stipulation of Facts
In the prior proceedings, attorney Frantz stipulated that petitioner was the sole shareholder of two corporations which were subsequently merged into Truck Haven. He stipulated that Mr. Hagaman intended to place all of his truck stop operations under a single corporate entity, but that the debt position of other Hagaman corporations made it preferable for petitioner to own the stock. Prior to the merger of the two corporations with Truck Haven, Mr. Hagaman was actively involved in their business operations. After the merger, it was stipulated, all of Truck Haven's stock "was owned by William S. Hagaman and his wife Bonnie C. Hagaman." Petitioner challenges any stipulated fact which holds her to be a shareholder in Truck Haven as incorrect. Respondent asserts that petitioner was a shareholder in Truck Haven and, consequently, that she received a constructive dividend equal to: (1) the unreported income which her former husband skimmed from Truck Haven; (2) the amounts paid by the corporation to build her children's homes; and (3) the amounts paid by Truck Haven for insurance and repairs of a boat owned solely by Mr. Hagaman. Respondent *755 argues in the alternative that we lack jurisdiction to reconsider the finding of this fact or that petitioner has not met her burden of proof to be relieved from the stipulation. Respondent argues that we are prohibited from considering at this trial any issues other than the application of the innocent spouse doctrine since any jurisdiction we have over the instant matter is predicated on the bankruptcy court's order lifting the statutory stay provided by 11 U.S.C. section 362(a)(8). We do not read the bankruptcy court's order to so restrict our consideration of petitioner's liability for the deficiencies in taxes and interest in this case. Based on the record of bankruptcy proceedings relating to petitioner's request for reconsideration in this Court, we interpret the bankruptcy court's action as intending for us to hear petitioner's arguments as they relate to her tax liability. The bankruptcy court was concerned, as were we in granting petitioner's request for rehearing, that this matter progressed through trial without the meaningful participation of one of the parties, either personally or through a representative. Although that court did not intend *756 for us to redetermine the many facts established in the first trial, it did intend for us to provide a forum in which petitioner might litigate substantive tax issues as they affect her personally. If we are unable to address a stipulation entered by counsel found not to have fully represented petitioner's interest, we are unable to fulfill that purpose. The stipulated fact at issue affects our decision whether petitioner qualifies as an innocent spouse. Consequently, we believe our reconsideration of a fact stipulated by counsel who did not fully represent petitioner's interests is not inconsistent with the bankruptcy court's order. We conclude that we have jurisdiction to reconsider whether petitioner was a shareholder in Truck Haven. (2) Was Petitioner a Shareholder?
Finding that we have jurisdiction to decide whether petitioner was a shareholder in Truck Haven during the years in question, we proceed to respondent's second argument. This argument focuses on the binding nature of stipulations and maintains that petitioner presented insufficient evidence to be relieved from a stipulation entered at the prior trial. *757 Stipulations are the "bedrock of Tax Court practice." Branerton Corp. v. Commissioner, 61 T.C. 691, 692 (1974). Parties are required to stipulate facts and evidence which are not in dispute. Rule 91. The purpose of stipulating evidence is to limit the factual issues to be decided by the Court and, thus, to expedite the trial process. A stipulation is binding on the party as an admission and the Court *2186 will not permit him or her to contradict a stipulation except where justice requires. Rule 91(e). However, we are not bound by stipulations at variance with actual evidence introduced at trial. Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976). We have so held where the taxpayer prejudiced by the stipulated facts was not represented by counsel. Jenkins v. Commissioner, T.C. Memo. 1988-326. Our Rules permits a party to contradict stipulated facts where justice so requires. Rule 91(e). In this case, we find that justice requires that petitioner be permitted to offer evidence contrary to the stipulated facts. In granting petitioner's motion for reconsideration, we concluded that attorney Frantz did not fully represent petitioner's *758 interests in the prior trial of this matter. We now consider his purported representation of two taxpayers who were party to a hostile divorce sufficient to permit further inquiry into stipulated facts which affect petitioner. Justice is not served by binding petitioner to stipulated facts which she did not approve or authorize, either personally or through representative counsel. Petitioner presented credible evidence that she was not a shareholder in Truck Haven and pointed to inconsistencies in the evidence tending to show that she was such a shareholder. Although the burden is on petitioner to come forward with additional evidence to contradict the stipulated fact, we think it important that respondent presented no additional evidence to support his position that petitioner was a shareholder in Truck Haven. The record is devoid of any direct proof of petitioner's holdings in any Hagaman corporation. Respondent had notice of petitioner's contest to the stipulated facts, and we take respondent's failure as meaningful. Evidence tending to show petitioner was a shareholder in Truck Haven consists of intermittent references to petitioner as a shareholder in minutes of meetings *759 contained in the corporation's record book and of documents executed by petitioner as a purported shareholder of Truck Haven. The records of meetings of Truck Haven shareholders or directors which were presented at trial were incomplete. Many of the minutes referring to petitioner's presence at meetings contain identical language and are identical in appearance, suggesting that they were "forms". Truck Haven's secretary testified that some of the minutes contained in Truck Haven's corporate books were prepared for signature and did not account for meetings actually held. These documents have little value in determining whether petitioner was a shareholder in Truck Haven. We likewise reject documents executed by petitioner as determinative of the issue. We are satisfied that petitioner signed documents at her husband's request without knowing the contents thereof. Stock certificates or other evidence of an equity interest in Truck Huddle or Truck Harbor issued to petitioner were not presented at either trial. Jack Self, Truck Haven's secretary, testified that he did not remember issuing a Truck Haven stock certificate to petitioner, and petitioner testified that she neither *760 possessed nor received stock certificates in Truck Haven. However, Mr. Self also testified that some stock certificates were missing from the stockbook. [9] The most compelling testimony regarding whether petitioner was a shareholder was heard at the first trial from Mr. Hagaman: Q Did your wife own part of the stock of Hagaman Truck Haven, Incorporated during the years 1975 through 1978? A I assume she owned half of it. Q Do you know for a fact she owned half of it? A No. It's my understanding that under Tennessee law she owns half of what the husband owns. The record contains countless references to Mr. Hagaman *761 as the principal shareholder of Truck Haven during the years in question. In his pretrial memorandum, respondent himself referred to Mr. Hagaman as the "sole stockholder and president of Hagaman Truck Haven, Inc. [during] the taxable years 1975 through 1978, inclusively". A review of the existing corporate records shows that Mr. Hagaman operated his business in a manner suiting his purposes. There is no evidence that petitioner had any control over the corporations. Other than a memorandum of merger, documents relating to the merger of Truck Huddle and Truck Harbor were not signed by petitioner, even though she was the alleged sole shareholder of those corporations. That petitioner was held out as a shareholder in Truck Haven in certain corporate records does not require us to conclude she was a shareholder. Based on the evidence, we find that petitioner was not a shareholder in Truck Haven during the years at issue. (3) Even if Petitioner Was a Shareholder, She Did Not Receive Constructive Dividends
While we conclude that petitioner was not a shareholder in Truck Haven, we note that respondent's argument that petitioner received constructive dividends equal to (1) *762 amounts skimmed by Mr. Hagaman and (2) expenses paid by the corporation, must otherwise fail. *2187 Petitioner sustained her burden of showing that she did not benefit from the misappropriated funds and payments made by Truck Haven. During the years in question, Mr. Hagaman skimmed cash funds from vending machines located in truck stops operated by Truck Haven. Mr. Hagaman also caused the corporation to pay construction workers who built the Hagaman children's homes. He further caused Truck Haven to pay certain bills which we decided were not corporation expenses. Although we sustained respondent's determination that these amounts were dividend income, we did not decide the extent to which petitioner and Mr. Hagaman individually realized dividend income. We do so here. Respondent's determination is presumptively correct, and petitioner has the burden of proving that respondent erred. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). In this regard, however, we are mindful that "The law imposes much less of a burden upon a taxpayer who is called upon to prove a negative *763 -- that he did not receive the income which the Commissioner claims -- than it imposes upon a taxpayer who is attempting to sustain a deduction." Weir v. Commissioner, 283 F.2d 675, 679 (6th Cir. 1960); United States v. Besase, 623 F.2d 463, 465 (6th Cir. 1980); Mysse v. Commissioner, 57 T.C. 680, 694 (1972). Gross income includes dividend distributions from a corporation to its shareholders. Secs. 61(a)(7), 301(c)(1), and 316. The fact that dividends are not formally declared does not preclude the existence of constructive dividends. Busch v. Commissioner, 728 F.2d 945 (7th Cir. 1984), affg. a Memorandum Opinion of this Court; Pierce v. Commissioner, 61 T.C. 424, 430 (1974). Integral to the concept of constructive dividends is that the corporation confer an economic benefit on its shareholders without the expectation of repayment. United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969). The motive of the corporation is not determinative, and constructive dividends may be found *764 contrary to the expressed intent of the corporation. Sachs v. Commissioner, 277 F.2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959). Constructive dividends may be disproportionate to the shareholder's percentage share of the corporation's stock. United Mercantile Agencies, Inc. v. Commissioner, 23 T.C. 1105 (1955); Meyer v. Commissioner, 45 B.T.A. 228 (1941). (a) Funds Skimmed by Mr. Hagaman
A shareholder's diversion of corporate funds constitutes a constructive dividend to the shareholder. Drybrough v. United States, 238 F.2d 735 (6th Cir. 1956); Truesdell v. Commissioner, 89 T.C. 1280 (1987). In most cases involving removal of corporate income for the use of the shareholders, the required benefit to the shareholder is easily identified since the shareholder at issue often is the person who misappropriated the funds. This is not one of those cases. Petitioner did not exercise control over Truck Haven. She was not involved in Mr. Hagaman's scheme, nor did she have any knowledge *765 of its existence. The unreported income was not surrendered to petitioner or otherwise made available for her use. Instead, what funds Mr. Hagaman provided her to pay household expenses from 1975 through 1978 were derived from payroll checks and were reported on joint income tax returns. It is not apparent from facts in evidence that any of the skimmed income was converted to the use of petitioner. Respondent argues that petitioner benefitted from the income because she received certain properties in the divorce. We cannot agree. The properties awarded to petitioner were acquired by petitioner and Mr. Hagaman before the years in question. They were not purchased with the unreported income of 1975 through 1978, nor were their purchases made possible by the unreported income. The unreported income was not deposited in the household account from which petitioner drew funds to pay routine bills and expenses. Further, we do not find persuasive respondent's argument that the repayment of a loan by petitioner and Mr. Hagaman's daughter and son-in-law constitutes such a benefit to petitioner, absent evidence that the loaned funds were somehow derived from income unreported for the *766 years in question. Thus, even if petitioner were a shareholder, she would not have realized dividend income equal to the amounts which Mr. Hagaman pirated from his corporation. (b) Payments Regarding Mr. Hagaman's Boat
Payment of a shareholder's personal expenses or payments made to third parties which benefit a shareholder constitute constructive dividends to the shareholder. Gardner v. Commissioner, 613 F.2d 160 (6th Cir. 1980), affg. a Memorandum Opinion of this Court; Baird v. Commissioner, 25 T.C. 387 (1955). See also United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969). The constructive dividend analysis is not appropriate with respect to corporate payments effected by Mr. Hagaman that were without the knowledge or approval of petitioner and which did not benefit petitioner. Barrett v. Commissioner, T.C. Memo. 1989-243. Truck Haven made payments with respect to a *2188 boat owned by Mr. Hagaman. These payments were made in 1975 and 1976, a period during which the relationship between petitioner and Mr. *767 Hagaman suffered. At the first trial, Mr. Hagaman argued but did not establish that the expenditures were business expenses of Truck Haven. Although petitioner admits to spending much time on boats during the earlier and happier years of her marriage, petitioner spent little, if any, such time with Mr. Hagaman following the commencement of his affair. The fact that petitioner benefitted from her husband's ownership of a boat in the past does not compel us to conclude that she benefitted from the payments made by Truck Haven during the years in issue. Consequently, we find that, even if she were a shareholder in the corporation, petitioner would not have received a constructive dividend to the extent Truck Haven made payments relating to Mr. Hagaman's boat. (c) Payments Regarding the Hagaman Children's Homes
Petitioner likewise did not "benefit" from Truck Haven's payments toward construction of the Hagaman children's homes. Payments made by a corporation to benefit the children of the corporation's shareholders are constructive dividends to the shareholders. Epstein v. Commissioner, 53 T.C. 459 (1969); Hufnagle v. Commissioner, T.C. Memo. 1986-119; *768 Byers v. Commissioner, 199 F.2d 273 (8th Cir. 1952), affg. a Memorandum Opinion of this Court. The benefit drawn from corporate payments benefitting a shareholder's children has been described as "paternal satisfactions," Byers v. Commissioner, supra, and the "fulfillment of [a] parental desire." Hufnagle v. Commissioner, supra.Truck Haven paid the construction workers who built the children's homes. Petitioner was not aware of the payments. In fact, petitioner herself wrote checks from the household account to assist her children with construction costs. The household checking account was funded by Mr. Hagaman's payroll checks and other amounts, all of which were properly reported on the joint returns filed by petitioner and Mr. Hagaman during the years in issue. In this case, petitioner was unaware of the payments which benefitted her children. Consequently, she derived no "material satisfaction" from those payments. Rather, petitioner is more likely to have derived such satisfaction from contributions which she made herself. Since petitioner did not benefit from the payments made by Truck Haven regarding the *769 children's homes, she would not have received a constructive dividend from Truck Haven equal to the amounts expended by the corporation if she were a shareholder. Because we find that petitioner was not a stockholder in Truck Haven and, thus, received no constructive dividends from that corporation, no part of the understated amount is attributable to her. It follows that the understatement is attributable to grossly erroneous items of the spouse not seeking innocent spouse relief -- Mr. Hagaman. Thus, the second element for innocent spouse status is present in this case. Knowledge of Substantial Understatement
The knowledge required by section 6013(e)(1)(C) is not knowledge of the tax consequences of a transaction but knowledge of the transaction itself. Quinn v. Commissioner, 524 F.2d 617 (7th Cir. 1975), affg. 62 T.C. 223 (1974); Bokum v. Commissioner , 94 T.C. 126 (1990). The standard applied in determining whether a taxpayer had reason to know of omissions is whether a reasonable person under the taxpayer's circumstances at *770 the time of the signing of the return could be expected to know of the omissions. Shea v. Commissioner, 780 F.2d 561 (6th Cir. 1986), affg. on this issue a Memorandum Opinion of this Court. Petitioner appeared at trial and testified that she did not know her husband was skimming cash income from his corporation. Petitioner did not have access to Truck Haven's financial records or information regarding its checking account, nor was she involved in the corporation's daily management. The further fact that, during the years in question, relations between petitioner and Mr. Hagaman were deteriorating lends additional credibility to her testimony. Even Irving Daugherty, Truck Haven's chief financial officer, did not know that Mr. Hagaman was skimming cash income from Truck Haven. We believe petitioner's testimony to be credible and find that she had no actual knowledge of the facts giving rise to the tax liability. For the same lack of access to Truck Haven records and communications, we find that petitioner did not have knowledge of payments made by the corporation for the construction of the Hagaman children's homes and for expenses relating to Mr. Hagaman's boat. *771 The statute also requires that petitioner have no reason to know of the omissions from income. A spouse is not required to have perfect knowledge of the family's finances, but neither is she permitted to close her eyes to unusual expenditures. Mysse v. Commissioner, 57 T.C. 680 (1972). We have fully discussed petitioner's lack of involvement in Truck Haven's business affairs. Mr. Hagaman's deposits into the household account were reasonably accounted for and did not constitute suspicious activity to put petitioner on notice of the unreported income. The fact that petitioner had a *2189 high quality of life during the years in question is also not sufficient to suggest that Mr. Hagaman had unreported income since petitioner and Mr. Hagaman reached that plateau long before 1975. Petitioner did not make extravagant purchases during the years in question and, to the extent of petitioner's knowledge, neither did Mr. Hagaman. We find that petitioner did not have reason to know about her former husband's unreported income. Equity under Section 6013(e)(1)(D)
Current section 6013(e)(1) requires this Court to find that it is inequitable to hold petitioner liable for *772 the tax deficiency. In making this determination, whether the spouse benefitted from the unreported income is considered. Purcell v. Commissioner, 86 T.C. 228 (1986), affd. 826 F.2d 470 (6th Cir. 1987); H. Rept. 98-432 (Part 2) 1501, 1502 (1984).[10] Benefit from unreported income does not include amounts furnished the spouse as support.
We have found that petitioner did not benefit from the unreported income. During the years at issue, petitioner was estranged from Mr. Hagaman and had little knowledge of his activities. It appears that Mr. Hagaman used his unreported income to further his adulterous affair and not to benefit petitioner who continued the same standard of living during 1975 through 1978. Because of these facts, we find that it would be inequitable to hold petitioner liable for taxes arising from unreported income that resulted *773 from her former husband's fraudulent dealings with his businesses. For the foregoing reasons, we hold that petitioner established the elements necessary for innocent spouse status under section 6013(e), and, therefore, that she is not liable for the deficiencies determined by respondent and the interest thereon. An appropriate decision will be entered. Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. References to "petitioner" herein are to Mrs. Bonnie C. Hagaman, solely. Necessary references to her former husband, William S. Hagaman, are to "Mr. Hagaman". References to petitioner and Mr. Hagaman jointly are to "the Hagamans" or "petitioner and Mr. Hagaman".↩
3. In his appearance before the Court to argue petitioner's Motion for Leave to File Motion for Reconsideration of Opinion and for New Trial Out of Time, petitioner's counsel also stated that the statute of limitations would also be raised as a defense to petitioner's liability. As this issue was not pursued at trial, or discussed in the briefs and memoranda submitted by the parties to the Court, we do not consider this issue. We note, however, that in our prior opinion we found that the underpayment of taxes was due to fraud within the meaning of sec. 6653(b) as to William S. Hagaman. Thus, the statute of limitations does not bar assessment and collection of the joint liability. Sec. 6501(c)(1); Vannaman v. Commissioner, 54 T.C. 1011, 1018↩ (1970).
4. The family savings account was monitored by Mr. Hagaman, and petitioner did not have access to its records.↩
5. Petitioner sometimes attended trade conventions and the openings of truck stops with Mr. Hagaman as his wife.↩
6. We are unable to ascertain solely from written records whether or not petitioner owned 100 percent of the stock of Hagaman Truck Harbor, Inc., or Hagaman Truck Huddle, Inc., since neither petitioner nor respondent offered the corporate records of those entities into evidence at either trial in this matter. ↩
7. In 1982, the U.S. District Court for the Eastern District of Tennessee entered a judgment against Mr. Hagaman, pursuant to a guilty plea, to a charge under section 7201 of attempting to evade or defeat his joint Federal income tax for 1975.↩
8. Cf. Barrett v. Commissioner, T.C. Memo. 1989-243↩.
9. Respondent would have us accept his argument that, since the stock book shows that Mr. Hagaman issued shares of Truck Haven stock to his second wife, it would be consistent to suppose that Mr. Hagaman similarly issued shares of stock to petitioner during the time they were "happily married". We decline to accept this speculation as fact.↩
10. See Bell v. Commissioner, T.C. Memo. 1989-107; Smith v. Commissioner, T.C. Memo. 1987-226↩ n.8.