T.C. Memo. 2000-213

UNITED STATES TAX COURT

MANUEL AND MARGARET KARCHO, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14400-96.                    Filed July 13, 2000.

Erwin A. Rubenstein and Robert W. Siegel, for petitioners.

Timothy S. Murphy, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined the following deficiencies, additions to tax, and penalties with respect to petitioners' Federal income taxes:

|  |  | Additions to Tax and Penalties | | | |
|  |  | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1)(A) | 6653(b)(1)(B) | 6653(b) | 6663 |
| 1987 | $59,943 | $44,957 | * | -- | -- |
| 1988 | 53,843 | -- | -- | $40,382 | -- |
| 1989 | 55,476 | -- | -- | -- | $41,607 |
| 1990 | 47,368 | -- | -- | -- | 35,526 |
| 1991 | 2,842 | -- | -- | -- | 2,132 |

* 50 percent of the interest due on $59,943.00 for the taxable year 1987.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are the Tax Court Rules of Practice and Procedure.

After concessions,[1] the remaining issues for decision are: (1) Whether petitioners failed to report income from petitioner Manuel Karcho's wholly owned S corporation of $143,552 for 1987, $149,458 for 1988, $160,600 for 1989, $137,976 for 1990, and $21,603 for 1991; (2) whether petitioners are liable for additions to tax for fraud for 1987 and 1988, and for fraud penalties for 1989, 1990, and 1991; and (3) whether the period of

---

[1] Respondent concedes decreases in the deficiencies of $21.10 for 1988, $916.73 for 1989, and $733.00 for 1991. Petitioners concede that they failed to report gross receipts from the sale of soft drinks, candy, and miscellaneous items of $16,428.50 for 1987, $21,230.90 for 1988, $14,241.27 for 1989, and $9,269.70 for 1990. Respondent concedes that petitioners are entitled to additional costs of goods sold with respect to these sales of $9,630.25 for 1987, $11,892.45 for 1988, $8,529.64 for 1989, and $5,981.85 for 1990.

limitations on assessment bars respondent's determinations for each year at issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, supplemental stipulation of facts, and attached exhibits. Petitioners Manuel Karcho and Margaret Karcho are husband and wife who resided in Southfield, Michigan, at the time they filed their petition. Petitioners filed joint returns for the years in issue.

Mr. Karcho had emigrated from Iran at age 12 and had very little formal education. Mrs. Karcho, who emigrated from Malta at age 11, completed a high school education in the United States and during the years in issue was employed as a membership and billing system analyst for a health insurance provider.

During the years in issue Mr. Karcho, through his wholly owned S corporation, Banner Amusement Enterprises, Inc. (Banner), owned and operated an amusement arcade called the Space Station. Mr. Karcho had previously been employed as a manager of the Space Station before purchasing all of the stock of Banner in 1985 for $25,000 in cash and a $25,000 note to the seller. Mr. Karcho continued to manage the operations of the arcade during the years in issue, with some part-time help. The arcade was open 7 days a week.

The arcade generated income primarily through the operation of approximately 40 to 45 electronic games maintained for customers, as well as from the sale of soft drinks, candy, and miscellaneous items. Customers purchased tokens to operate the games from two token machines on the premises. The token machines accepted $5 and $1 bills, as well as quarters, and dispensed a corresponding number of tokens. The token machines contained meters designed to record each insertion of a bill or coin.

Meter Readings

Twice each day, Mr. Karcho recorded the readings from the meters in the token machines on a document labeled "Token Machines-Meter Readings" (Meter Readings Sheet). Each Meter Readings Sheet listed the total number of times the meters recorded the insertion of a $5 bill, $1 bill, or quarter during a day. The sheet in addition converted these currency totals into a total cash figure. Some of the Meter Readings Sheets also contained entries at the bottom for individual electronic games and for items identified only with initials. Dollar figures were recorded for these entries, which were added to the total cash figure recorded for the day. Mr. Karcho made such recordings on the Meter Readings Sheets generally every day for each of the years at issue.

Daily Income and Cash Receipt Records

For each business day during the years in issue, Mrs. Karcho prepared a document entitled "Daily Income Report" that recorded a dollar figure equal to the amount of cash that Mr. Karcho deposited into Banner's bank account for that business day. A bank receipt for the amount of the deposit for each business day was also retained. The dollar figure on the "Daily Income Report", which was equal to the bank deposit, was substantially less than the total cash figure recorded on the Meter Readings Sheet for the same day. In addition, Mrs. Karcho prepared daily records labeled "Cash Receipts" which listed the daily figure for the bank deposit (under "Bank Deposit") and purported to break this figure down into components, based on the source of the income, labeled "Arcade Game Income", "Food & Pop Sales", as well as other sales, cash amounts, and receipts. The daily amounts recorded for "Arcade Game Income" by Mrs. Karcho were substantially less than the corresponding daily total cash figures recorded on the Meter Readings Sheets by Mr. Karcho. With respect to the amounts recorded by Mrs. Karcho as "Food & Pop Sales", petitioners have now conceded that these amounts understated the proceeds from Banner's sale of food items by $16,428.50 in the 1987 taxable year, $21,230.90 in 1988, $14,241.27 in 1989, and $9,269.70 in 1990.

The foregoing Daily Income and Cash Receipts records were provided by petitioners to their accountant for purposes of preparing Banner's Federal income tax returns covering each of the years in issue. The returns reported Banner's gross receipts as equal to the amounts deposited into Banner's bank account.

Reconciliation Sheets

Petitioners maintained another set of records during the years in issue, also labeled "Daily Income Report". These records, which for the sake of clarity we shall refer to as the Reconciliation Sheets, generally contained entries, for each business day, under headings labeled "Daily Income", "Deposit", "Part-Time", and "Net Income". In contrast with the "Daily Income" figures recorded on the Daily Income Report/Cash Receipts records described above, which treated the day's bank deposit as equal to "Daily Income", the entries under "Daily Income" on the Reconciliation Sheets generally match the total cash figure from the Meter Readings Sheet for the same day. The entries under "Deposit" generally match the day's bank deposit. The entries under "Net Income" reflect the difference; i.e., the amount by which the "Daily Income" entry exceeded the "Deposit" entry, less any amount entered under "Part-Time" (which only occasionally contained an entry).

<u>Representative Sample of Records</u>

A representative sampling of the various types of records kept by petitioners, all covering the period March 9-15, 1987, follows.

The Meter Readings Sheets for this period contain, inter alia, the following entries:

| <u>Day</u> | <u>Date</u> | <u>Total cash figure</u> |
|------------|-------------|--------------------------|
| Monday | March  9, 1987 | $558.25 |
| Tuesday | March 10, 1987 | 613.00 |
| Wednesday | March 11, 1987 | 577.00 |
| Thursday | March 12, 1987 | 609.00 |
| Friday | March 13, 1987 | 813.25 |
| Saturday | March 14, 1987 | 1,174.00 |
| Sunday | March 15, 1987 | 937.25 |

The "Daily Income Report" and "Cash Receipts" entries for the same period were:

<u>Daily Income Report</u>

| <u>Day</u> | <u>Date</u> | <u>Total Deposit</u> |
|------------|-------------|----------------------|
| Monday | March 9, 1987 | $375.00 |
| Tuesday | March 10, 1987 | 352.00 |
| Wednesday | March 11, 1987 | 369.00 |
| Thursday | March 12, 1987 | 393.00 |
| Friday | March 13, 1987 | 413.14 |
| Saturday | March 14, 1987 | 400.00 |
| Sunday | March 15, 1987 | 394.62 |

## Cash Receipts[1]

| Day | Deposit Date | Day of Business | Bank Deposit | Arcade Game Income | Food & Pop Sales | Other Cash Receipts Amount | Description |
|-----|------|----------|---------|--------|------|--------|-------------|
| Monday | 03/12/87 | 03/09/87 | $375.00 | $375.00 | --- | --- | --- |
| Tuesday | 03/12/87 | 03/10/87 | 352.00 | 352.00 | --- | --- | --- |
| Wednesday | 03/16/87 | 03/11/87 | 369.00 | 369.00 | --- | --- | --- |
| Thursday | 03/16/87 | 03/12/87 | 393.00 | 393.00 | --- | --- | --- |
| Friday | 03/16/87 | 03/13/87 | 413.14 | 413.14 | --- | --- | --- |
| Saturday | 03/16/87 | 03/14/87 | 400.00 | 350.00 | $50.00 | --- | --- |
| Sunday | 03/19/87 | 03/15/87 | 394.62 | 394.62 | --- | --- | --- |

[1] The entries under the "Food & Pop Sales" column of the cash receipts records appeared each Saturday and generally showed a round figure between $30 and $70.  Entries under the "Other Cash Receipts" column appeared infrequently and generally recorded public telephone commissions or proceeds from the sale of an arcade game.

The record in this case contains only the "Cash Receipts" records for 1987, 1988, and 1989.  Nonetheless, petitioners have stipulated that they provided similar records to their accountant for each of the years in issue.

The Reconciliation Sheets (which petitioners actually labeled as "Daily Income Report") contain the following entries for the same period:

## Daily Income Report [Reconciliation Sheet]

### March 1987

| | Daily Income | Deposit | Part-Time | Net Income[1] |
|-----|--------|---------|-----------|------------|
| Monday, March 9 | $558.00 | $375.00 | --- | $183.00 |
| Tuesday, March 10 | 613.00 | 352.00 | --- | 261.00 |
| Wednesday, March 11 | 577.00 | 369.00 | --- | 208.00 |
| Thursday, March 12 | 609.00 | 393.00 | --- | 216.00 |
| Friday, March 13 | 813.00 | 413.14 | $59.50 | 340.36 |
| Saturday, March 14 | 1,174.00 | 400.00 | 300.00 | 474.00 |
| Sunday, March 15 | 957.62 | 394.62 | --- | 563.00 |
| | $5,301.62 | $2,696.76 | $359.50 | $2,245.36 |

[1] In some instances, this column was labeled "Net Cash".

A review of the foregoing sampling shows that, on the Reconciliation Sheet, the "Daily Income" figure ties to the daily total cash figure on the corresponding day's Meter Readings Sheet, whereas the Daily Income Report and Cash Receipt entries tie in only to the bank deposit figure.  Further, the Daily Income Report and Cash Receipt entries tie in to each other in the sense that the latter appears to be a breakdown, by source, of the figures on the former.  Petitioners kept similar records covering all of the periods in issue.

Search of Petitioners' Premises and Records Seizure

All of the records previously described were confiscated in connection with a search of Banner's business premises and petitioners' residence by respondent's Criminal Investigative Division (CID) in February 1991.  Also found among petitioners' records was an adding machine tape prepared and labeled by Mrs. Karcho as follows:

```
        Pocket Money
       #8*2386.......

    7    9,643.46 +
    6    9,530.22 +
    5    7,505.18 +
    4    9,567.25 +
    3   10,945.88 +
    2    8,971.98 +
    1    7,857.06 +
   12    7,075.68 +
   11    7,245.60 +
        78,342.31*
```

```
                    Meter Reading

              7    21,254.37 +
              6    21,835.31 +
              5    18,254.49 +
              4    20,463.36 +
              3    21,646.46 +
              2    19,004.57 +
              1    18,787.77 +
             12    17,315.88 +
             11    17,674.56 +
                  176,236.77 *
```

The amounts listed under "Pocket Money" are equal to the monthly totals for the "Net Income" column of the Reconciliation Sheets for 1987. The amounts under "Meter Reading" are equal to the 1987 monthly totals for "Daily Income" on the Reconciliation Sheets (which mirror the cash totals recorded on the daily Meter Readings Sheets for that period).

In addition to the seized documents, the CID found a safe built into the basement floor of petitioners' residence, which was empty. Elsewhere in the residence, the CID found approximately $10,000 in cash.

Cash Expenditures and Cashier's Checks

During the years in issue, petitioners had substantial amounts of cash at their disposal, and Mr. Karcho frequently used cash and cashier's checks to carry on his personal affairs. On or about June 4, 1988, Mr. Karcho purchased an automobile in exchange for which he provided another automobile and $14,000 in cash. Also in June of 1988, Mr. Karcho sold a 1973 Rolls Royce

for $27,500. Mr. Karcho requested that the purchaser pay the $27,500 in the form of three cashier's checks for $9,500, $9,500, and $8,500.  During 1989, Mr. Karcho purchased 22 cashier's checks, all in amounts less than $8,000, totaling $65,942.30. The checks were payable to Mr. Karcho, and he purchased at least 19 of them with cash.  During 1990, Mr. Karcho purchased 17 cashier's checks, all in amounts less than $7,000, totaling $59,100.00.  These checks were also payable to Mr. Karcho, and he paid for them in cash.  From approximately late-July to mid-August 1990, Mr. Karcho purchased four cashier's checks:  three for $9,000 and one for $3,000.  These checks he used for the purchase of a 1986 Excaliber automobile.  In addition, Mr. Karcho made a downpayment on a residence with 13 cashier's checks, each for an amount less than $3,000, that he purchased between August 24, 1990, and January 16, 1991.

Criminal Investigation and Guilty Plea

The search and records seizure noted earlier resulted from a criminal investigation of Mr. Karcho initiated in 1991.  Mr. Karcho was ultimately charged with one count of attempted income tax evasion for the 1987 taxable year, in violation of section 7201, and one count of structuring transactions with intent to evade currency reporting requirements, in violation of 31 U.S.C. sec. 5324(3) (1994), in connection with the purchase of 13 cashier's checks between August 24, 1990, and January 16, 1991.

He pleaded guilty to each, in connection with which he admitted the following:

> I provided my accountant with false information regarding my 1987 income which caused him to prepare a false return that substantially underreported my income for that year. I signed the return and then filed it with the IRS. I also structured a transaction in which I bought real estate * * * by purchasing 13 cashiers [sic] checks from various banks each less than $3,000.00 to avoid the reporting requirements under Federal law.

Arcade Operations

Banner would often rent out the arcade on weekend mornings for children's private parties in which participants were allowed unlimited play on the games for 1 to 2 hours for a set fee. To supply the participants with tokens, Mr. Karcho would unlock the token machines and trigger a switch that caused the release of tokens. Mr. Karcho would then hand out tokens to the participants on an as needed basis. Mr. Karcho kept the keys to the token machines; when he was not present for private parties, he would provide an employee with cash for the purpose of obtaining tokens from the token machines to distribute.

Mr. Karcho employed part-time help at the arcade whom he paid with cash that was not reported on Banner's returns. Banner claimed deductions for "salaries and wages" on its returns for the fiscal years ended February 28, 1987, and February 29, 1988, but not on its returns for the years ended February 28, 1989 and 1990.

During 1984 and 1985, the arcade industry began facing competition from home video games that caused many arcades in the area surrounding Banner to go out of business. However, although Banner's business declined, Mr. Karcho kept the arcade in business and continued to run it through the time of trial, some 6 years after the last of the years in issue in this case.

In applying for a City of Royal Oak, Michigan, business license in 1987, Mr. Karcho knowingly failed to report 8 electronic games maintained on Banner's business premises. By so doing, Mr. Karcho temporarily evaded licensing fees of $100 per game, until an inspection by the City revealed the undisclosed games.

Notice of Deficiency

On April 8, 1996, respondent issued a notice of deficiency covering petitioners' 1987, 1988, 1989, 1990, and 1991 taxable years. Respondent determined the unreported income for each year at issue by treating Banner's gross receipts as equal to the total of the daily Meter Readings Sheets for each year, plus estimated receipts from the sale of food and miscellaneous items, and subtracting the gross receipts reported on Banner's return for each year.[2]

---

[2] The records examined by respondent did not contain Meter Readings Sheets for January and February of 1991; as a result, respondent did not determine that there was any unreported arcade
(continued...)

OPINION

Deficiency

The record in this case amply demonstrates that petitioners maintained two sets of books with respect to the operations of Banner.  One set, provided to their accountant each year for purposes of preparing Banner's Federal income tax returns, recorded gross receipts as an amount equal to the deposits made to Banner's corporate bank account.  These records also purported to provide a breakdown of the daily bank deposit figure into categories by source of income (e.g., "Arcade Game Income", "Food & Pop Sales") which, at least in the case of the "Food & Pop Sales", petitioners have conceded substantially understated gross receipts.[3]  The other set of records, which came to light as a

_____

[2](...continued)
game income with respect to those months in 1991. In addition, there were no records with respect to food sales for Banner's 1991 taxable year, and as a result respondent did not determine any unreported income with respect to food sales for that year.

The parties have reached agreement with respect to the amount of gross receipts, as well as additional costs of goods sold, attributable to Banner's food sales in 1987, 1988, 1989, and 1990.  See supra note 1.  Accordingly, the unreported income that remains in dispute concerns arcade game receipts only.

[3] The record in this case contains the "Daily Income Records", which treat a day's bank deposit amount as that day's gross receipts, covering all of the years in issue except 1991. The "Cash Receipts" records in evidence, which purport to break down the bank deposit amount into components such as arcade game and food sales, cover all years except 1990 and 1991.  However, petitioners have stipulated that they provided similar records to their accountant for each year at issue for purposes of preparing
(continued...)

result of being seized during the execution of a search warrant covering petitioners' business premises and residence, recorded gross receipts as an amount equal to the daily cash totals compiled by Mr. Karcho based on daily readings of the token meters as entered on the Meter Readings Sheets. The gross receipts figures so recorded are substantially greater than those recorded in the other set of records. Moreover, these records illustrate that petitioners were tracking the cash that was not being deposited into Banner's bank account (or reported to their accountant); that is, the records list, for each business day, an amount corresponding to the total cash figure recorded on the Meter Readings Sheet, the amount deposited into Banner's bank account, and the difference between these figures, frequently denominated as "net".[4]

Respondent determined that petitioners had unreported income from Banner by treating the Meter Readings Sheets as an accurate measure of Banner's gross receipts from arcade game sales. Specifically, respondent determined Banner had unreported income in each year from arcade game sales equal to the amount by which

---

[3](...continued)
Banner's income tax returns.

[4] Certain monthly totals of this daily "net" figure were labeled "pocket money" on one of the seized documents.

the total cash receipts recorded on the Meter Readings Sheets exceeded the amount reported on Banner's return.

The record in this case demonstrates an evidentiary foundation for respondent's determination of unreported income. Petitioners do not dispute that Mr. Karcho wholly owned Banner, an S corporation that operated a cash-based amusement arcade. Thus, petitioners have the burden of showing error in respondent's determination of unreported income. See Pittman v. Commissioner, 100 F.3d 1308, 1313 (7th Cir. 1996), affg. T.C. Memo. 1995-243; United States v. Walton, 909 F.2d 915, 918 (6th Cir. 1990).

Taxpayers are required to keep such records as are sufficient to establish taxable income. See sec. 1.6001-1(a), Income Tax Regs. If the taxpayer does not keep such records or the records are inaccurate, the Commissioner has "great latitude" to reconstruct the taxpayer's income by any reasonable means. Giddio v. Commissioner, 54 T.C. 1530, 1532-1534 (1970); see Harbin v. Commissioner, 40 T.C. 373, 377 (1963). In the instant case, petitioners are in a largely untenable position with respect to their records, it having been discovered that they kept two sets of books, each appearing to record the income of Banner. Petitioners have effectively conceded that the Daily Income/Cash Receipts records did not accurately record Banner's gross income and expenses, due to their stipulation that the

amounts recorded on those records from the sale of food and miscellaneous items understated income by substantial amounts. Also, in connection with his guilty plea for attempted income tax evasion for 1987, Mr. Karcho admitted, in reference to the Daily Income/Cash Receipts records, that such records were false, and petitioners have stipulated that similar records were provided to their accountant for each year in issue for purposes of preparing Banner's income tax returns. Finally, petitioners argue on brief that although the Daily Income/Cash Receipts records did not record all of Banner's gross receipts, they are nevertheless substantially accurate as to Banner's net income because they also did not record numerous expenses that were paid with unrecorded cash. As for the other set of records (the Meter Readings Sheets and the Reconciliation Sheets that tie in to them), petitioners attempt to dismiss them as entirely fictitious. In these circumstances, respondent is entitled to reconstruct petitioners' income by any reasonable means. See Giddio v. Commissioner, supra; Harbin v. Commissioner, supra, and cases cited therein. On the basis of this record, we believe respondent's use of the Meter Readings Sheets to reconstruct petitioners' income is reasonable.

Petitioners mount various assaults on respondent's use of the Meter Readings Sheets in an attempt to show error in the income reconstruction. First, as noted, Mr. Karcho testified

that the Meter Readings Sheets were entirely fictitious, maintained and deliberately inflated by him in order to mislead prospective purchasers as to the profitability of the arcade. This self-serving testimony is uncorroborated and improbable, and we need not accept it. Other than his testimony, there is no evidence that Mr. Karcho attempted to sell the arcade, and he still owned it at the time of trial, some 6 years after the last of the years in issue. Further, examination of the Meter Readings Sheets shows that they, along with the Reconciliation Sheets that reconciled them with Banner's bank deposits, were meticulously kept on a daily basis for several years. We do not believe that petitioners would have gone to these lengths merely to mislead a prospective purchaser. Petitioners' contention that the Meter Readings and Reconciliation Sheets were mere concoctions is not credible.

As a fallback, petitioners adduced various testimony to the effect that the token machine meters were inaccurate because (i) they frequently malfunctioned, (ii) Mr. Karcho routinely unlocked the machines and manually released tokens to give out at private parties at the arcade, or (iii) Mr. Karcho, when he could not be present to unlock the machines, would give as much as $200 in cash to a Banner employee who would use it to obtain tokens from the machines to give out at private parties.

We accord little weight to this testimony.  Only Mr. Karcho testified that the malfunctions of the token machines or the manual release of tokens resulted in the meters recording the insertion of cash when it did not occur; no other witness corroborated this point.  As for the use of business cash to obtain tokens for private parties, the employee who corroborated this practice worked at the arcade for no more than 4 months of the 46 months[5] covered by respondent's income adjustments, and the practice only occurred on those weekends when Mr. Karcho was not present.  We are satisfied in the circumstances of this case that the Meter Readings Sheets are a reasonably accurate record of Banner's gross receipts for the years at issue, which is sufficient to sustain the deficiency determination.  Respondent's reconstruction of petitioners' income need only be reasonable; precision is not required.  See Harbin v. Commissioner, supra; Campise v. Commissioner, T.C. Memo. 1980-130.

The probability that the Meter Readings Sheets are reasonably accurate is enhanced by other factors.  The higher gross receipts reflected on them provide a plausible explanation of the source of the substantial cash that Mr. Karcho had at his disposal during the years in issue.  Mr. Karcho's explanation for

---

[5]  No adjustments were made with respect to the last 2 months of Banner's fiscal year ended Feb. 28, 1991, due to the absence of Meter Readings Sheets covering that period.

this cash--that he had a cash hoard saved since childhood--is not credible.[6] Also, petitioners concede on brief that Banner had unreported income. Finally, the nature of the Meter Readings Sheets themselves, the figures on which are detailed and meticulous, not rounded or repetitive, lend support to their authenticity.

Petitioners' next argument proceeds on the concession that Banner had unreported gross receipts from arcade game sales. Petitioners argue that even if Banner had gross receipts in excess of the amounts recorded on the Daily Income/Cash Receipts records and reported on Banner's returns, the returns nonetheless accurately reflected taxable income because Banner paid expenses with unreported cash, such as for part-time workers, food and miscellaneous supplies, and game parts and repairs. Except in the case of part-time workers (discussed infra), petitioners' claim of unreported expenses is supported only by vague testimony. They provided no basis on which any amount of such expenses might be estimated,[7] let alone an amount equal to the

---

[6] We note in this regard that Mr. Karcho purchased Banner in 1985 for $25,000 cash and a $25,000 note to the seller. If Mr. Karcho had a cash hoard predating his acquisition of Banner of the size that would account for his cash transactions during the years in issue, we wonder why he found it necessary to finance one-half of the acquisition price.

[7] On brief, petitioners argue that a comparison of the deductions taken on the last tax return filed by Banner under its

(continued...)

unreported income determined by respondent. Cf. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930)(court may estimate the amount of deductible expenditures if convinced such expenditures were made); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985) (court must have some basis on which to make an estimate under the Cohan rule). Petitioners' argument fails, among other reasons, for lack of substantiation.

There is one respect in which respondent's reconstruction of petitioners' income from Banner is not reasonable, however. The Reconciliation Sheets consistently list a gross receipts amount for each day (which corresponds to the cash total for that day on the Meter Readings Sheet), from which is subtracted (i) a bank deposit amount and (ii) an amount, generally once or twice a week, labeled "part", "part time", or "part/full workers" to produce a net figure generally labeled "net" or "net income" or "net cash". Petitioners contend that the amounts in the "part time" columns represent the payment of cash to workers at the arcade, which should give rise to a deduction. That workers were sometimes paid in cash and sometimes by check is corroborated by

---

[7](...continued)
previous ownership with the deductions claimed by Banner during the years in issue provides support for their contention that Banner understated deductions during the years in issue because they were paid in cash. We reject this argument. As far as the record reveals, the return filed by the previous owner was never audited, and return positions are not evidence.

other testimony.  Respondent has not allowed any offset for these amounts in his income reconstruction and contends that it cannot be ascertained whether all or part of these amounts was already deducted on Banner's returns.

We disagree with respondent in part.  Examined as a whole, the Reconciliation Sheets produce a strong inference that petitioners maintained them to keep track of their net unreported cash from the business.  The "part time" amounts were recorded nearly as meticulously over a period of years as the totals from the Meter Readings Sheets.  Respondent's reconstruction of Banner's income effectively treats the Reconciliation Sheets[8] as accurate insofar as they record cash receipts but disregards them insofar as they record cash expenses that might reduce income. An examination of Banner's tax returns reveals that for some of the years in issue, Banner took no deduction for "salary and wages".  We conclude that for certain years in which Banner did not claim a deduction for wages (Banner's fiscal years ended February 28, 1989 and 1990) a reasonable reconstruction of Banner's income requires an offset for the amounts recorded under "part time"; namely, $28,914 in 1989 and $28,410 in 1990.[9]  We

_____

[8]  Although respondent's income reconstruction employed the Meter Readings Sheets and not the Reconciliation Sheets, the gross receipts figures on each are the same.

[9]  One month (March 1989) is missing from the Reconciliation
(continued...)

agree with respondent that for 1987 and 1988, no such adjustment would be reasonable, because Banner deducted amounts for wages in those years and the record does not indicate whether these amounts were paid by cash or check. With respect to 1991, we do not believe any offset is appropriate because the reconstruction of gross receipts for that year is obviously incomplete. That is, there were no Meter Readings Sheets for the last 2 months of fiscal year 1991 and no food sales records for the entire year; as a consequence, respondent did not determine any additional gross receipts from those sources for those periods.

Accordingly, we sustain respondent's determination that petitioners had unreported income from Banner of $143,552 for 1987, $149,458 for 1988, and $21,603 for 1991. We further hold that petitioners had unreported income from Banner of $131,686 for 1989 (i.e., respondent's reconstruction of $160,600 less an offset of $28,914 for wages paid with unreported cash) and $109,566 for 1990 (i.e., respondent's reconstruction of $137,976 less an offset of $28,410 for wages paid with unreported cash).

---

[9](...continued)
Sheets for Banner's fiscal year ended Feb. 28, 1990, in the record.

Fraud

Respondent also determined that petitioners are liable for (i) additions to tax for fraud under section 6653(b)(1)(A) and (B) for 1987, (ii) an addition to tax for fraud under section 6653(b) for 1988, and (iii) a penalty for fraud under section 6663 for 1989, 1990, and 1991.

Respondent bears the burden of proving fraud and must establish it by clear and convincing evidence. Thus, we do not bootstrap a finding of fraud upon a taxpayer's failure to disprove the Commissioner's deficiency determination. See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

To carry his burden of proof, respondent must show by clear and convincing evidence both (1) that an underpayment of tax exists for each year in issue and (2) that at least some part of the underpayment was due to fraud. See secs. 6653(b), 6663(a), 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). If the Commissioner establishes that some portion of the underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the

underpayment which the taxpayer establishes is not attributable to fraud.[10]  See secs. 6653(b)(2), 6663(b).

Where joint returns are filed, the fraud of one spouse is not automatically attributed to the other; the other spouse is not liable for fraud unless the Commissioner shows that some part of the underpayment is due to the fraud of such other spouse. See secs. 6653(b)(3), 6663(c).

The Commissioner meets his burden of proof if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes.  See Hagaman v. Commissioner, 958 F.2d 684, 696 (6th Cir. 1992) (citing United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990)), affg. and remanding T.C. Memo. 1987-549; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  A conviction for the willful attempt to evade or defeat income taxes under section 7201 precludes a taxpayer in a subsequent civil proceeding from denying that an underpayment in his income tax for the taxable year of conviction was due to fraud.  See Gray v. Commissioner, 708 F.2d 243 (6th Cir. 1983), affg. T.C. Memo. 1981-1; Plunkett v. Commissioner, 465 F.2d 299 (7th Cir.

_____

[10]  Sec. 6663(b), applicable to petitioners' 1989, 1990, and 1991 taxable years, clarifies that petitioners need only establish by a preponderance of the evidence that some portion of the underpayment is not attributable to fraud.

1972), affg. T.C. Memo. 1970-274; Tomlinson v. Lefkowitz, 334 F.2d 262, 265 (5th Cir. 1964).

Absent such estoppel, the existence of fraud is a question of fact to be decided on consideration of the entire record. See Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Because direct proof is seldom available, fraud may be proven by circumstantial evidence. See Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Moreover, the taxpayer's entire course of conduct may establish fraud, see Spies v. United States, 317 U.S. 492 (1943), and in determining fraud, we take into account the taxpayer's experience and education; see Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.

Keeping a second set of false records creates an especially strong inference of an intent to defeat or evade taxes. See Spies v. United States, supra at 499; Lee v. Commissioner, T.C. Memo. 1995-597; Raeder v. Commissioner, T.C. Memo. 1965-230; 57 Herkimer St. Corp. v. Commissioner, T.C. Memo. 1961-223, affd. per curiam 316 F.2d 726 (5th Cir. 1963). Other indicia or "badges" of fraud include: (1) Understating income; (2) failure to report income over an extended period of time; (3) giving implausible or inconsistent explanations of behavior; (4)

concealing assets; (5) engaging in illegal activities; and (6) dealing in cash.  See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Rowlee v. Commissioner, supra at 1125.  A showing of the taxpayer's willingness to defraud others is also relevant in determining whether he committed fraud with respect to his income tax obligations.  See McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).  Moreover, engaging in conduct to avoid currency-reporting provisions also evidences the type of concealment indicative of tax fraud.  See Parks v. Commissioner, 94 T.C. 654, 665 (1990); Podolece v. Commissioner, T.C. Memo. 1992-227; Savage v. Commissioner, T.C. Memo. 1992-129; Sea Sports Center, Inc. v. Commissioner, T.C. Memo. 1991-209, affd. without published opinion 979 F.2d 1537 (11th Cir. 1992); Morris v. Commissioner, T.C. Memo. 1990-580.

On the basis of our review of the entire record, we believe respondent has shown by clear and convincing, indeed overwhelming, evidence that both petitioners committed fraud for each of the years in issue.  An examination of the dual sets of records maintained by petitioners, together with the circumstances under which such records came to light and Mr. Karcho's recurrent dealings in large amounts of cash (which led to a structuring conviction), leads inescapably to the conclusion

that petitioners kept two sets of books for the specific purpose of concealing large portions of Banner's income to avoid paying tax thereon.  One set of records, which was provided to their accountant for purposes of preparing Banner's tax returns, purported to demonstrate that Banner's gross receipts were equal to the amounts deposited into its bank account, which was not the case.  The other set, which recorded substantially higher receipts for each year in issue, creates a very strong inference that the cash deposited into Banner's bank account did not constitute the business' entire gross receipts.

As for the establishment of an underpayment in each year, petitioners have stipulated that they had substantial amounts of unreported gross receipts from the sale of food items for every year in issue except 1991, conclusively establishing an underpayment for those years.  With respect to the 1991 underpayment, as well as the remainder of each underpayment in the other years, we believe that the evidence establishes clearly and convincingly that the Meter Readings Sheets accurately recorded gross receipts from arcade game sales, demonstrating that there was an underpayment arising from the understatement of gross receipts from this source as well.  Petitioners efforts to portray the Meter Readings Sheets as fictitious or erroneous are implausible, inconsistent, and unpersuasive, and they have not

offered a credible explanation of the source of the very large amounts of cash at Mr. Karcho's disposal during this period.

As for fraudulent intent for each of the years in issue, we believe petitioners' maintenance of two sets of books, and their providing the erroneous version to their accountant for tax reporting purposes in each year, is virtually conclusive on the question of fraudulent intent in each year.  In any event, there are additional indicia of fraud, including the extended period in which income was understated, the extensive dealings in cash and cashier's checks that were obviously designed to circumvent currency-reporting requirements, and Mr. Karcho's admitted misrepresentations to local authorities in an effort to reduce his licensing fees.  Finally, Mr. Karcho's section 7201 conviction with respect to 1987 estops him from denying fraudulent intent in that year.

We also conclude that respondent has established that some portion of the underpayment is attributable to the fraud of each petitioner.  Although petitioners argue that Mrs. Karcho did not commit fraud, we believe the evidence shows that Mrs. Karcho was intimately involved in the fraudulent record keeping in each year.  It was Mrs. Karcho, who was employed as a billing system analyst, who prepared the false records given to the accountant, which records were designed to deceive because they purported to break down the bank deposit amounts into fictitious subtotals

based on the source of receipts.  Also, among the records seized by respondent's agents was an adding machine tape on which Mrs. Karcho had labeled the unreported monthly cash tallies as "pocket money".

We hold that respondent has established by clear and convincing evidence that the underpayments in each of the years in issue are attributable to the fraud of each petitioner and that petitioners have not established that any portion of such underpayments is not attributable to fraud.  Accordingly, the period for assessment with regards to those years remains open. See sec. 6501(c)(1); Sisson v. Commissioner, T.C. Memo. 1994-545 (fraud for purposes of section 6501(c) is the same as fraud for penalty purposes), affd. without published opinion 108 F.3d 339 (9th Cir. 1996).

We have considered all of petitioners' remaining arguments and, to the extent not addressed herein, find them meritless.

To reflect the foregoing,

Decision will be entered under Rule 155.